McWHIRTER DISTRIBUTING COMPANY, INC., et al., Plaintiffs-Appellants,

v.

TEXACO INC., Defendant-Appellee.

M.A.P. OIL COMPANY, INC., et al., Plaintiffs,

v.

TEXACO INC., Defendant-Appellant,

v.

DEPARTMENT OF ENERGY, Third-Party Defendant-Appellee.

Nos. 9–49, 9–50.

Temporary Emergency Court of Appeals.

Argued Nov. 13, 1980.

Decided June 1, 1981.

---

Mark Kreitman, Dept. of Energy, Washington, D. C., with whom Paul G. Wallach, Paul M. Geier and Emily Sommers, Washington, D. C., were on the brief for Dept. of Energy, third-party defendant-appellee.

Michael H. Bonner, Froneberger, Bonner & Zeff, San Francisco, Cal., with whom Henry D. Froneberger, San Francisco, Cal., was on the brief for plaintiffs-appellants, McWhirter Distributing Co., Inc., et al.

David A. Luttinger, White Plains, N. Y., with whom David G. Yetter, Los Angeles, Cal., and Eric Watt Wiechmann, Cummings

& Lockwood, Stamford, Conn., were on the brief for defendant-appellee, Texaco Inc. in No. 9–49 and were on the brief for defendant-appellant, Texaco Inc. in No. 9–50.

Before CHRISTENSEN, JAMESON and DUNIWAY, Judges.

CHRISTENSEN, Judge.

These two appeals involve a single civil action which originated as a private damage suit in the United States District Court for the Northern District of California. McWhirter Distributing Company, Inc., and other independent petroleum distributors (the distributors) brought suit against Texaco Inc. (Texaco) pursuant to the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. §§ 751 *et seq.* (incorporating *inter alia* § 210 of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C. § 1904 note), alleging that a Texaco gasoline price increase violated regulations promulgated under the EPAA and codified in 10 C.F.R. Parts 210–212. The district court granted partial summary judgment in favor of Texaco on the regulatory claim,[1] and this appeal by McWhirter and the other distributors, designated as No. 9–49, followed. We reverse.

The second appeal, No. 9–50, involves a claim filed in the same action by Texaco against the Department of Energy (DOE),[2] in reliance upon the Federal Tort Claims Act, ch. 646, 62 Stat. 982 (1948) (codified in scattered sections of 28 U.S.C.), for alleged tortious violation by DOE of its own regulations in instigating an investigation against Texaco. The district court dismissed Texaco's claim. After noting *sua sponte* and resolving a question of jurisdiction beyond that argued by the parties, we affirm this dismissal, but for a reason differing somewhat from those assigned by the district court.

NO. 9–49, McWHIRTER.[3]

*District Court Proceedings*

On January 28, 1977, Texaco increased the price of gasoline it sold to some of its independent distributors without similarly increasing the price to its retail class of trade. Texaco admittedly thereby sought to reduce independent distributor demand in PADD V,[4] its western region. Several of the independent distributors brought suit against Texaco, complaining that the "unequal price increase" violated the EPAA and regulations promulgated thereunder. After almost three years, during which considerable discovery and other proceedings were conducted, Texaco moved for summary judgment, contending that its action complied with express authorization in the regulations and thus was lawful. The district court agreed and accordingly granted summary judgment in favor of Texaco.

Concluding that plaintiffs had not alleged a direct violation of either the "maximum allowable price" rule or the rule prohibiting

1. Although the distributors had also alleged violation of antitrust laws, the decision of the district court unfavorable to them was appealed to the United States Court of Appeals for the Ninth Circuit and not to this court. Included in the distributors' appeal to the Ninth Circuit was a precautionary appeal of the regulatory claim, and Texaco took a similar appeal of its FTCA claim to that court.

2. For the sake of simplicity; we refer to the Department of Energy and its predecessor agencies, the Federal Energy Administration and the Federal Energy Office, as "DOE."

3. Some confusion is engendered by the fact that each of these appeals has a separate name even though both arose from the same case in the district court. Originally, the case was denominated "*M.A.P. Oil Company, et al. v. Texaco Inc.*" since "*M.A.P. Oil Company, Inc.*" headed the long list of distributors that were

plaintiffs in the court below. Among those plaintiffs was "*McWhirter Distributing Company, Inc.*" When the distributors filed their appeal, the name "*McWhirter Distributing Company, Inc.*" headed the shorter list of parties to the appeal; "*M.A.P. Oil Company, Inc.*" and several other parties to the original case did not join in the appeal. Thus, plaintiffs-appellants appropriately entitled their appeal "*McWhirter Distributing Company, Inc., et al. v. Texaco Inc.*" Texaco's appeal arose out of the original suit and thus retains the name of that suit.

4. PADD V, an acronym for Petroleum Administration for Defense District Five, basically consists of California, Oregon, Washington, Hawaii, Alaska, Nevada and Arizona. 10 C.F.R. § 212.82. The United States is divided into five such districts which conform roughly to the distribution regions of the oil industry.

"termination" of supplier/purchaser relationships, the district court did not discuss those issues. It turned to the claim that "a petroleum seller cannot lawfully increase prices unequally among classes of purchasers," noting that the preamble to the "equal application rule," 10 C.F.R. § 212.83(h), interprets that rule as meaning that " 'increased costs may be unequally applied to prices charged to classes of purchaser,' " as long as the refiner absorbs the appropriate "penalty." 41 Fed.Reg. 30021 (July 21, 1976). "In other words, the rule deters unequal price increases. It does not forbid them." Applying the rule of deference outlined in *Standard Oil Co. v. DOE*, 596 F.2d 1029, 1055 (TECA 1978), the court concluded:

> Plaintiffs have not provided a persuasive reason for departing from this agency construction. Ruling 1975–2, 40 Fed.Reg. 10655 (1975), does not compel a departure. That ruling emphasized the importance of the maintenance of price differences among classes of purchaser.... The equal application rule furthers this aim, but it does not forbid unequal price increases.

The court next addressed plaintiffs' "alternate claims" that Texaco's price increase violated general regulatory provisions prohibiting "retaliatory action," "discrimination," and the modification of "normal business practices." Apparently assuming that a violation of these general rules can be predicated only on an indirect violation of a specific rule, the court held that Texaco's compliance with the equal application rule of section 212.83(h) shields Texaco from liability under the general rules. "Consequently, the seller's motive has no regulatory significance." [5]

### Factual Background

In addition to distributing gasoline to ultimate end-users through its own marketing system, Texaco contracts with independent distributors who in turn supply commercial users and retail sales outlets. Each of these independent distributors competes with Texaco's own outlets, as well as with all outlets of other brands. Plaintiffs-appellants on this appeal are such independent distributors. Prior to January 27, 1977, these distributors paid Texaco a price stated in terms of a discount from Texaco's retail tankwagon price (the price Texaco charged its own retail dealers for gasoline).

As DOE assigned new supply obligations to the distributors,[6] they exercised their rights under C.F.R. § 211.13(c)(3) [7] by ap-

---

**5.** Many of the issues raised in the district court and on this appeal were also raised and discussed in parallel administrative proceedings. In February, 1977, the distributors filed an administrative complaint with DOE. After conducting an investigation, the Office of Special Counsel (OSC) of DOE on November 23, 1977, issued a Notice of Probable Violation (NOPV) to Texaco. Texaco entered written and oral responses objecting to the issuance of the NOPV. After considering Texaco's response, OSC issued a Proposed Remedial Order (PRO) on December 14, 1978, followed by an amended PRO on December 26. It was this order and the other proceedings leading up to it that were the bases for Texaco's tort claim against DOE, which is the subject matter of the appeal in No. 9–50 (M.A.P.) considered later in this opinion. In essence, the amended PRO charged Texaco with violations of both the antidiscrimination provisions of § 210.62(b) and the provisions of § 210.62(a) prohibiting modification of normal business practices. On January 12, 1979, Texaco filed a Notice of Objection to the amended PRO, later detailing its contentions in a Statement of Objections. The Office of Hearings and Appeals (OHA) of DOE heard oral presentations from the parties on June 19, 1979. On August 15, 1979, OHA granted the Objection filed by Texaco, apparently influenced in a degree by the district court's decision now being reviewed. Although OHA determined that appropriate facts might give rise to the violation of the regulations in question, it concluded that the proposed findings of fact outlined by OSC in the amended PRO "are insufficient as a matter of law to support the conclusion that Texaco violated any DOE regulations as a result of its January 1977 price action. Accordingly, we shall dismiss the PRO with prejudice."

**6.** 10 C.F.R. § 211.12(e)(3) provided in part:

> Any wholesale purchaser which does not have a base period supplier ... or whose base period supplier(s) or new supplier ... is unable to supply it with sufficient amounts of allocated product may apply to DOE ... to be assigned a supplier and a base period volume on a temporary or permanent basis.

**7.** 10 C.F.R. § 211.13(c)(3) provided:

> All suppliers which receive a certification of an adjustment to base period use made

plying to DOE for an increase in their allotments of gasoline from Texaco. DOE granted these requests over objection by Texaco. From prior to 1972 through 1976, Texaco obtained part of its supply of gasoline for west coast distribution through an agreement with Exxon whereby Exxon refined gasoline for Texaco. In June of 1976 Exxon informed Texaco that it would terminate its processing agreement on December 31, 1976. Texaco asserts it thus faced a potential supply shortage in PADD V.

On January 28, 1977, Texaco implemented a price increase in PADD V consisting of a $.005 per gallon increase in the retail tankwagon price of premium gasoline and a $.015 per gallon increase in its distributor price for the product. No increase was charged to Texaco's retail and consumer classes of purchasers for regular and unleaded gasoline, while the independent distributors were charged an additional $.01 per gallon for those products. The net effect of the "unequal price increases" was to reduce the differential between Texaco's retail and independent distributor prices by one cent per gallon.

### Regulatory Background

In November, 1973, Congress passed the Emergency Petroleum Allocation Act, 15 U.S.C. §§ 751 *et seq.*, in order *inter alia* to stabilize the nation's general economy and the petroleum industry in particular. DOE and its predecessor agencies promulgated regulations mandated by the Congress and designed to implement the provisions of the EPAA.[8] A basic objective of those regulations was to maintain the supplier/purchaser relationship that existed in 1972–73. The Mandatory Petroleum Allocation Regulations set out in 10 C.F.R. Part 211 delineated limitations governing the allocation of petroleum products by suppliers.

The Mandatory Petroleum Price Regulations contained in Part 212 set out the specific pricing rules. These rules provided, generally speaking, that a refiner could not charge in excess of a "maximum allowable price," which was defined, and again we use broad terms, as the 1973 base price plus any increased costs of the refiner. These rules did not require refiners to pass increased costs on to the purchasers; they merely allowed them to do so. During a period of ample supply of crude oil, for example, competition among various refiners might be so intense that a particular refiner would choose to set its price below the "maximum allowable price" by not passing on some of its own increased costs. When a refiner elected not to pass costs on to purchasers, it could "bank" those unrecouped costs for later passthrough. Any time a company added previously unrecouped costs to its current price, it, of course, had to reduce its "bank" of those costs.

There were some limitations, however, on this right to pass on increased costs to purchasers, for DOE sought to distribute the burden of these increased costs as widely and uniformly as feasible. The major limi-

pursuant to this paragraph or § 211.85, or which receive a certification from any other supplier of an adjustment to base period use under this paragraph or § 211.85 which has been certified to that other supplier, may in turn certify to their suppliers the amount of the adjustment and shall receive an adjustment in proportion to that part of their base period use received from each supplier to cover the certified increases granted under this paragraph or § 211.85, or the decreases mandated under § 211.85.

**8.** On January 28, 1981, President Reagan issued Executive Order 12287, "Decontrol of Crude Oil and Refined Petroleum Products," which provides in pertinent part:

By the authority vested in me as President by the Constitution and statutes of the United States of America, including the Emergency Petroleum Allocation Act of 1973, as amended (15 U.S.C. 751 *et seq.*), and notwithstanding the delegations to the Secretary of Energy in Executive Order No. 11790, as amended by Executive Order No. 12038, and in order to provide for an immediate and orderly decontrol of crude oil and refined petroleum products, it is hereby ordered as follows: Section 1. All crude oil and refined petroleum products are exempted from the price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended. The Secretary of Energy shall promptly take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order.

tation relevant here was provided by section 212.83(h), the "equal application rule." This provided an economic incentive for refiners to pass previously unrecouped costs equally to all classes of purchasers. If a refiner applied these increased costs unequally, it had to reduce its "bank" of previously unrecouped costs by an amount that was larger than the amount of previously unrecouped costs actually recouped. Such reduction in a refiner's ability to recoup its banked costs constituted a "penalty" for effecting an "unequal price increase." Thus 10 C.F.R. § 212.83(h) provided in pertinent part:

(h) *Equal application among classes of purchaser.* (1) *General rule.* Except as provided in paragraphs (h)(2) and (3) of this section, when a firm calculates the amount of increased costs not recouped that may be added to May 15, 1973, selling prices to compute maximum allowable prices in a subsequent month, it shall calculate its revenues as though the greatest amount of increased costs actually added to any May 15, 1973, selling price of the product concerned and included in the price charged to any class of purchaser, had been added, in the same amount, to the May 15, 1973, selling prices of that product and included in the price charged to each class of purchaser.

(2) *Special rules.* (i) *Gasoline.* When a firm calculates the amount of increased costs not recouped that may be added to May 15, 1973, selling prices of gasoline to compute maximum allowable prices in a subsequent month, it may, notwithstand-

ing the general rule in paragraph (1) above, compute revenues as though (A) the greatest amount of increased costs actually added to any May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser in a particular region (as defined in § 212.-82), had been added, in the same amount, to the May 15, 1973, selling period from the date of issuance of this Special rule prices of that product and included in the price charged to each class of purchaser in that region, and (B) the greatest amount of increased costs actually added to the May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser in any region had been added, in the same amount (less any actual differential or three cents per gallon, whichever is less) to the May 15, 1973, selling prices of that product and included in the price charged to any class of purchaser in any other region.

In addition to these specific allocation and pricing regulations in Parts 211 and 212, the General Allocation and Price Rules in Part 210 provided broad requirements and prohibitions. It is therein made clear that Part 210 applied to both Part 211 and Part 212.[9]

These General Allocation and Price Rules prohibited "retaliatory actions" as therein defined, the modification of any "normal business practices in effect during the base period specified in Part 211 for that allocated product," so as "to result in the circumvention of any provision of this chapter,"

---

9.　　　　　Subpart A—Scope

§ 210.1 Purpose.

The purpose of this Part is to set forth the provisions applicable to both Parts 211—Mandatory Petroleum Allocation Regulations and Part 212—Mandatory Petroleum Price Regulations, appearing in this chapter.

§ 210.2 Applicability.

Effective 11:59 p.m. d. s. t. January 14, 1974, the provisions of this Part apply to all covered products produced, refined or imported into the United States. . . .

§ 210.3 Exceptions and exemptions.

When necessary to accomplish the purposes of the Act, the Department of Energy

may permit an exception or an exemption to the regulations of this part. . . .

. . . .

Subpart C—Exemptions

§ 210.31 Scope

Price adjustments and allocation provisions with respect to forms and transactions set forth in this subpart are exempt from and not included within the coverage of this chapter [*i.e.*, certain exemptions specified in subpart C not pertinent to this case and Chapter 11—Department of Energy, including Subchapter A, dealing with Oil and including among others Parts 11 and 12 to which reference already has been made].

and "discrimination" among purchasers of any allocated product as therein defined.[10]

### Contentions on Appeal

The distributors contend that the granting of summary judgment was improper because there were genuine issues of material fact requiring trial. More particularly it is claimed (1) that the distributors had alleged direct violations of both the maximum price regulations and the regulations prohibiting terminations of supplier/purchaser relationships, which the district court in granting summary judgment to Texaco erroneously failed to recognize, and (2) that the district court erred in concluding that if section 212.83(h) by its terms permitted an unequal price increase, the General Allocation and Price Rules of Part 210 regulations could not limit or prohibit such increase and that the district court erred in disregarding related factual issues.

Texaco maintains that the distributors are wrong on all points and summarizes its position as follows:

Texaco's basic position can be reduced to a single proposition: the applicable price rule, § 212.83(h) not only permits price increases that are unequal in *nature* but also permits them *for the purpose* of affecting demand. But if this construction is correct, then it follows that it would be inconsistent to construe such conduct for such purpose (i.e., Texaco's conduct and motive in this case) to be prohibited by other regulations. In other words, the correct construction of § 212.-

---

10. Subpart D—General Rules

§ 210.61 Retaliatory actions.

No firm (including an individual) may take retaliatory action against any other firm (including an individual) that files or manifests an intent to file a complaint of alleged violation of, or that otherwise exercises any rights conferred by the Act, any provision of this part, or any order issued under this chapter. For the purposes of this paragraph, "retaliatory action" means any action contrary to the purpose or intent of the Economic Stabilization Program or the Department of Energy and may include a refusal to continue or sell or lease, any reduction in quality, any reduction in quantity of services or products customarily available for sale or lease, any violation of privacy, any form of harassment, or any inducement of others to retaliate.

§ 210.62 Normal business practices.

(a) Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provision of this chapter. "Summer fill" programs and other "dating" or seasonal credit programs are among the normal business practices which must be maintained by a supplier under this paragraph, if that supplier had such programs in effect during the base period. Credit terms other than those associated with seasonal credit programs are included as a part of the May 15, 1973 price charged to a class of purchaser under Part 212 of this Chapter. Nothing in this paragraph shall be construed to require suppliers to sell to purchasers who do not arrange proper credit or payments for allocated products, as customarily associated with that class of purchaser during the base period (for seasonal credit), or on May 15, 1973 (for other credit terms). However, no supplier may require or impose more stringent credit terms or payment schedules on purchasers than those in effect for that class of purchasers during the base period (for seasonal credit), or on May 15, 1973 (for other credit terms).

(b) No supplier shall engage in any form of discrimination among purchasers of any allocated product. For purposes of this paragraph, "discrimination" means extending any preference or sales treatment which has the effect of frustrating or impairing the objectives, purposes and intent of this chapter or of the Act, and includes, but is not limited to refusal by a retail marketer of motor gasoline or diesel fuel to furnish or sell any allocated product due to the absence of a prior selling relationship with the purchaser, or establishment of new volume purchase arrangements where customers of retailers agree in advance to purchase in excess of normal amounts of motor gasoline or diesel fuel and thereby receive preferential treatment.

(c) Any practice which constitutes a means to obtain a price higher than is permitted by the regulations in this chapter or to impose terms or conditions not customarily imposed upon the sale of an allocated product is a violation of these regulations. Such practices include, but are not limited to devices making use of inducements, commissions, kickbacks, retroactive increases, transportation arrangements, premiums, discounts, special privileges, tie-in agreements, trade understandings, falsification of records, substitution of inferior commodities or failure to provide the same services and equipment previously sold.

83(h) is the key to the correct construction of the other regulations advanced by plaintiffs.

Additionally, Texaco contends that its price increase did not violate the general regulations, not being covered by the regulatory definitions of "discrimination," "retaliation," or "normal business practice."

## Standard for Review

■ The well-established rule is that summary judgment may be granted only where there is (1) no genuine issue of any material fact and (2) the prevailing party is entitled to judgment as a matter of law. The party opposing a motion for summary judgment is entitled to have all facts viewed in the light most favorable to it and to all reasonable inferences which may be drawn from the facts. *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1065 (TECA 1978). The moving party must show that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). If the nonmoving party has raised by pleadings a genuine issue of material fact, and the evidentiary matter in support of the motion for summary judgment does not establish the absence of such issue, summary judgment must be denied even though no opposing evidentiary matter is presented. *See Adickes v. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439 (9th Cir. 1979).

■ The very nature of a controversy may render summary judgment inadvisable. "[S]ummary procedures should be used sparingly . . . where motive and intent play leading roles. . . ." *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Summary procedures are especially salutary where issues are clear-cut and simple, but should not be based upon indefinite factual foundations involving a welter of statutory or regulatory provisions the application of which may depend on undeveloped facts. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256–57, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948). Although it is proper to resolve even difficult legal issues by summary judgment if the requirements of the Rule have been clearly met, a court " 'should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law.' " *N.L.R.B. v. Smith Industries, Inc.*, 403 F.2d 889, 893 (5th Cir. 1968), quoting *Palmer v. Chamberlin*, 191 F.2d 532, 540 (5th Cir. 1951). "Complex cases where the questions are not, and often cannot be, conveniently isolated as pure questions of law are not appropriately disposed of by summary judgment." *Elliott v. Elliott*, 49 F.R.D. 283, 284 (S.D.N.Y.1970).[11]

## Discussion

■ The district court did not determine either as a matter of fact or law whether Texaco had shown that its increased price

11. We have treated this as an appeal from a summary judgment. Texaco moved for dismissal of the regulatory claims under Rules 16 and 56; the lower court granted the "motion for partial summary judgment," dismissing all regulatory claims without dismissing the antitrust claims. Plaintiffs-appellants here contend that summary judgment is only appropriate where the court considers materials outside the pleadings and that the motion for dismissal in this case should have been construed as being under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. This contention fails. Even though the typical role of summary judgment is to go beyond the pleadings to consider matters presented by affidavit, deposition, and other extrapleading materials, summary judgment may be based solely on the pleadings. Rule 56(b) itself provides that a "party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment." See 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2713 at 392 (1973); 6 *Moore's Federal Practice* ¶ 56.09 at 56–166, 56–167 (2d. ed. 1976). In any event, several extrapleading matters accompanied the memoranda filed by the parties and thus were before the court at the time it granted "partial summary judgment" for defendant Texaco. Whether considered discretely as a matter of pleading or as on summary judgment, the answer here would be the same. *See Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972).

was within the maximum allowable price, for the court held that the distributors had not placed this matter in issue. We disagree. In their Second Amended Complaint they alleged violations of section 212.81 (applicable to products refined by or purchased by a refiner), section 212.82 (defining significant terms, including "maximum allowable price"), and section 212.83 (the refiner's "Price rule").[12] The distributors also alleged that Texaco "overcharged said plaintiffs . . . in an amount in excess of that prescribed by law." In a "joint pretrial statement" the distributors' claims include violation of the price regulations, including sections 212.82 and 212.83. It is true that this pretrial statement was not formally signed, but it appears as part of the record before us, was referred to in the final argument and does at least reflect the claims of the distributors. In response to the court's questioning at the final hearing prior to dismissal of the regulatory claims, counsel for the distributors indicated their contention to be that Texaco had "failed to comply with both price regulations and the allocation regulations."

Similarly, the district court concluded that the distributors had not alleged a direct violation of the antitermination provisions of section 211.9. Again, we cannot agree. The Second Amended Complaint raised that issue. In addition to the above-mentioned reference to the allocation regulations during oral argument, the distributors in their trial memorandum specifically noted the issue of "whether an action which is intended to reduce volumes of purchases

and does reduce volumes of purchases is a termination in and of itself." Texaco cites no instance where the distributors dropped either of these claims and we find none. Since each involved genuine issues of material fact thus far unresolved in the record, summary judgment was inappropriate.

The district court declared that DOE's interpretation of section 212.83(h), as outlined in the preamble to that rule, defeats the distributors' claim that Texaco's unequal price increase violates the price regulations: "[The agency] stated that the rule causes a seller which applies costs unequally to lose the right to recoup a part of those costs. Preamble, 41 Fed.Reg. 30021 (1976). It made clear, however, that 'increased costs may be unequally applied to prices charged to classes of purchaser.'" The court concluded that "[a]bsent a showing that a seller's price exceeds the lawful maximum, such an increase does not violate price rules. Plaintiffs do not make this showing. Their claim must therefore fail."

Thus the trial court shifted the burden of proof on a motion for summary judgment from the movant to the distributors. We agree that, as the trial court held, section 212.83(h) "deters unequal price increases [but] does not forbid them," since the regulations provided a penalty for the inequality. But the trial court without any affirmative showing by Texaco on the point erroneously assumed that there had been a compliance with the provisions of section 212.83(h) in the computation and reporting of the required penalty.[13]

---

**12.** Section 212.81 provided:

This subpart applies to each sale of a covered product which is purchased or refined by a refiner, except as provided in Subparts F and K.

Section 212.83(a)(1) provided:

A refiner may not charge to any class of purchaser a price for a covered product in excess of the maximum allowable price. . . .

Section 212.82 provided in pertinent part:

"Maximum allowable price" means the weighted average price at which the covered product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, computed in accordance with the provisions of § 212.83(a), plus increased product costs and increased non-product

costs incurred between the month of measurement and the month of May, 1973.

**13.** Texaco's response to the distributors' overcharge claim was primarily that its unequal nature did not render such price increase illegal. It did not establish on its own part that it had complied with the penalty provisions, a prerequisite to the legality of the uneven increase. In its brief on appeal, at page 2, it concedes such failure but again seeks to shift the burden to the distributors:

[T]hey disingenuously argued that dismissal [of the distributors' claim] should be denied because Texaco had not proven such facts as: 1) that it had a "bank" of increased costs sufficient to sustain the January 1977

■ There is a deeper problem which obstructed the summary judgment, and which Texaco seemed to apprehend at the trial as it mistakenly sought to have the trial court avoid it. In its trial memorandum, Texaco conceded that many of these pricing questions "would be *material* in a case alleging violation of § 212.83(*a*), the basic price rule which forbids sales in excess of the maximum allowable price." As we have now seen, the distributors did allege and continue to rely upon a violation of section 212.-83(a). There remains a complex array of unexplained regulations and related factual issues unevaluated and unresolved, which preclude summary disposition.[14]

The district court held that "a pricing action expressly permitted by specific rules" cannot be prohibited by the general regulations as Part 210. Apparently underlying this conclusion was the assumption that violation of the general rules can be predicated only on an indirect violation of a specific rule of Parts 211 and 212. In its brief at page 10 Texaco puts it this way: .

As stated at the beginning, Texaco's basic position reduces itself to a single logical proposition: if one regulation, § 212.83(h) permits a seller to make an unequal price increase with the purpose and expectation that it will affect demand, then such action for such purpose cannot be construed to violate some other section of the same regulatory scheme.

The District Court expressed this concept of regulatory construction by stating that "[i]t would offend fundamental fairness to penalize a regulated party for literal compliance with imperfect regulations."

There are some basic misconceptions here. Among these are the assumptions that exercised authority to make unequal price increases carries with it immunity from other requirements of the regulations; that the so-called general rules of Part 210 can come into play only if there is otherwise a direct or indirect violation of specific provisions of Parts 211 or 212, and that there is something unfair about requiring compliance with the provisions of other sections of the regulations in connection with exercise by a refiner of the pricing flexibility permitted by section 212.83(h).

It is apparent from the text already quoted that the provisions of Part 210 applied to allocations and price controls. Furthermore, its preamble declared that "[a] new Part 210 has been created establishing the general rules which apply to both the price control and allocation programs .... The creation of Part 210 recognizes the compelling necessity of viewing both allocation and price problems within the context of a single regulatory framework." 39 Fed.Reg. 1924 (January 15, 1974). These general rules prohibited, for example, acts that are "contrary to the purpose or intent" of the

price increase; 2) that its recovery of increased costs were in the proper amounts and in the proper sequence; 3) that in implementing the January 1977 unequal price increase it "invoked" the equal application rule; and 4) that it, in fact, took the penalty prescribed by that rule.

The simple answer to this mental sleight of hand was and is that no reference to these facts was made because plaintiffs never made any claim to which such facts would be material.

Texaco's position is not only contrary to the record, as has already been observed, but its very statement by Texaco supports the distributors' contention that these pricing issues were before the district court when Texaco's motion for summary judgment was argued.

**14.** A reference to the Refiner Price Rule, 10 C.F.R. § 212.83(a)(1) and the maximum allowable price definition, 10 C.F.R. § 212.82, *supra*,

demonstrates that refiners were required to compute a separate maximum lawful selling price for each class of purchasers based on the average lawful selling price charged to members of the class on May 15, 1973. The definitions of "class of purchaser" and "customary price differential," 10 C.F.R. § 212.31, any necessity to maintain classes of purchasers in existence on May 15, 1973, *see* Atlantic Richfield Company, 4 FEA ¶ 80,550 at p. 80,696 (1976), the computation of weighted average selling prices to the class as of May 15, 1973, the increased product costs for each class of purchaser, 10 C.F.R. § 212.83(c)(1), and other regulations upon which the determination of classes of purchaser and the effect of that determination upon the maximum allowable price involve many factual as well as legal issues, which may be rendered more critical by Texaco's disparate treatment of the distributors in question.

EPAA or regulations promulgated thereunder, and acts that "result in the circumvention of any [relevant] provision" in the regulations. Since each of the general regulations sets out a different standard of conduct, we will examine each relevant regulation individually.

■ Distributors argue that Texaco's price action was an unlawful retaliation. Section 210.61 provided that

No firm ... may take retaliatory action against any other firm ... that ... exercises any right conferred by the [EPAA], any provision of this chapter, or any order issued under this chapter. For the purposes of this paragraph, "retaliatory action" means any action contrary to the purpose or intent of the Economic Stabilization Program or the Department of Energy....

The essence of a retaliatory action is its nature as an improper response to the exercise by another of rights granted by the Act or regulations thereunder. In this respect, "motive" or "intent," as well as effect, is an essential element of a violation of this general regulation. It, indeed, under some circumstances could be clearly contrary to the purpose and intent of both the Act and its regulations for a refiner to raise its prices within otherwise permissible limits merely to harass or injure a purchaser or a class to which it belonged because it exercised rights guaranteed to it by the Act or its regulations. Any system which authorized such conduct so at variance with its own objects and purposes would seem both unfair and incomplete. It cannot be ruled as a matter of law that the objects and purposes of the Act and its regulations can be so thwarted despite the provisions of sec-

tion 210.61. There may be various gradations of such intent or conduct extending to legitimate reaction to conditions in the marketplace.[15] This is a problem inappropriate for resolution by summary judgment.

Distributors also contend that Texaco's "unequal price increase" constituted an illegal discrimination in violation of section 210.62(b) in that it was treatment which had the effect of "frustrating or impairing the objectives, purposes and intent" of the Act or its regulations. Again, there is no requirement there that a regulation of Parts 211 and 212 be violated. Support for this view is provided by the preamble to section 212.83(h), indicating that section 210.62(b) placed some limitations on a supplier's right to effect unequal price increases.[16] Furthermore, this interpretation is not inconsistent with the decision reached by OHA:

Although circumstances might exist in which price discrimination permitted by DOE class of purchaser regulations could result in a violation of section 210.62(b), we would be reluctant to reach such a conclusion unless it were shown that the pricing behavior was illegal under other applicable law, such as the antitrust statutes, or were accompanied by specific results that contravened the purposes of EPAA.

It is somewhat paradoxical in view of this subsequent reference to antitrust law that the district court retained for trial the distributors' antitrust claims based importantly upon the unequal price increase involved in their regulatory claim as to which summary judgment was granted. We do not necessarily agree with the limited view of the agency as to the reach of section 210.-

---

15. As was stated by the OHA in the parallel administrative proceedings, "we recognize the possibility that some legal price increases could be retaliatory ... and therefore illegal." OHA opinion at 9.

16. [I]t is apparent that, in implementing the increased pricing flexibility afforded by today's amendments [to § 212.83(h)], refiners in some instances may seek to institute price variations within a class of purchaser. As discussed above, this practice is permissible

under FEA price rules as long as it is undertaken for a purpose and in a manner which does not conflict with § 210.62(b). 41 Fed.Reg. 30021, 30022 (July 21, 1976). We do not decide the extent of the applicability of § 210.62(b) to the facts of this case. It is sufficient for our purposes to note that the preamble supports our conclusion that a refiner could have been in violation of the general regulations even if it had complied with the express provisions of Parts 211 and 212.

62(b). But in any event, just as the OHA had difficulty in perceiving a violation as a matter of law in the absence of a factual basis in the findings of the OSC, we cannot as a matter of law rule out a violation in the absence of the further exploration of, and findings concerning, material issues of fact which were precluded by summary judgment.

The distributors alleged a violation of the "normal business practices" rule of section 210.62(a). It is less clear that a violation of this section was not essentially dependent upon a direct or indirect violation of a provision of the allocation or price rules and particularly section 211.9(a) or section 211.-12. At least a modification of a "normal business practice" would have violated section 210.62(a) if the result had constituted a circumvention or frustration of its purposes or other regulations. Support for this view once again may be found in the preamble to section 212.83(h), recognizing that section 210.62(a) places limitations on a supplier's rights under section 212.83(h) by prohibiting modifications of normal business practices that would "circumvent the purposes of today's amendments." [17] We reject Texaco's

argument, adopted in a sense by the district court's opinion, that revisions of section 212.83(h) embodied such a balancing of all of the goals of the EPAA as to preclude related consideration of the General Rules.

We are concerned with a complex regulatory scheme in a context of considerations which the Congress considered especially sensitive.[18] The facts upon which the application of the rules depended were, if not wholly undeveloped, unmarshaled and largely ignored. Hence, Texaco's final argument here that, assuming the application of the General Rules, its price increase did not fall within their definitions of "retaliation," "discrimination," or modification of a "normal business practice," is premature. These and the other questions in this case can be properly resolved only on the basis of an adequately developed record and upon consideration of the application of the regulations in light of it.[19]

### Conclusions

In the instant case, the distributors have raised genuine issues concerning violations by Texaco of allocation, price and general

---

17. After discussing various practices regarding the delivery of petroleum products, the agency stated:
>  The prohibition in § 210.62(a) against modification of normal business practices in order to circumvent the FEA regulations applies, of course, to prohibit modification of normal delivery practices in order to circumvent the purposes of today's amendments.

41 Fed.Reg. 30021, 30022 (July 21, 1976).

18. As Texaco points out, the revisions to § 212.83(h) were intended to provide suppliers with additional flexibility to alleviate during times of ample supply dislocations caused by the operation of the previous stricter regulation. See Preamble, 41 Fed.Reg. 30021 (July 21, 1976). At the time in question here, however, Texaco faced a potential supply shortage, not a surplus. Additionally, the supply problem was created by the termination of a supply agreement with Exxon, not by the operation of the price regulations in general. Preferment by the oil company of its own outlets against the interests of independent distributors rendered quite relevant the objectives of the Act and regulations referred to in the provisions of the general rules upon which the distributors relied. Congress in the EPAA clearly expressed its intent to protect independent distributors in citing the need "to restore and foster competi-

tion" in all aspects of the petroleum industry and "to preserve the competitive viability of ... branded independent marketers." EPAA § 4(b)(1)(D). The conference committee stated that the Act requires "the mandatory allocation program to be so structured as to prevent major oil companies from ... favoring their directly-owned outlets over independent marketers." Conf.Rep.No. 628, 93rd Cong., 1st Sess., [1973] U.S.Code Cong. & Ad.News 2582, 2688, 2689. Furthermore, one of the objectives of the Act was "to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages." *Id.* at 2702.

19. We recently addressed a similar summary judgment problem in *Pacific Serv. Stations Co. v. Mobil Oil Corp.*, 636 F.2d 306 (TECA 1980). Plaintiffs had complained that the elimination of a discount had " 'raised the selling price to [appellants] to a price that exceeds the maximum allowable price.' " *Id.* at 309. As a basis for reversal and remand, Judge Zirpoli stated for the court that "[w]e recognize that appellants' contention was not specified with the particularity it deserved, but that fact does not operate to relieve Mobil of its burden on summary judgment of demonstrating its right to prevail as a matter of law." *Id.*

regulations as above noted. Texaco has not clearly demonstrated the absence of any "genuine issue as to any material fact" with respect to these alleged violations. While it may well be that the distributors in a trial situation would not have been able to sustain their burden of proof with respect to some or all of these issues in view of their lack of discovery concerning them,[20] or that further pretrial explanation could have eliminated some of these issues as insubstantial or not genuine, the present posture of the case does not permit any such assumptions. Nor does the complexity of the controlling regulations and the trouble it may have caused Texaco to demonstrate, if it could, that the increase in question was within the permissible maximum price, justify foreclosing this and the other preserved issues. The burden on its motion for summary judgment was Texaco's, not the distributors. If the price for sustaining the summary judgment rule is additional judicial bother, it is worth it, as it is counted worth it by the Rule itself, and the long line of authority so interpreting it.

Language in *Kennedy v. Silas Mason, supra*, confirms the present answer and, in conclusion, we paraphrase it in application here:

> The short of the matter is that we have ... extremely important [questions].... No conclusion in such a case should prudently be rested on an indefinite factual foundation. The case ... comes to us almost in the status in which it should come to a trial court. In addition to the welter of new contentions and [regulatory] provisions we must pick our way among ... [a maze of factual contentions], without full background knowledge of the dealings of the parties. The hearing of contentions as to disputed facts, the sorting of [regulations] to select relevant provisions ... and reduction of

the mass of conflicting contentions as to fact and inference from facts, is a task primarily for a court of one judge, not for a court of [three].

> . . . .

> Without intimating any conclusion on the merits, we vacate the [judgment] below and remand the case to the District Court for reconsideration and amplification of the record in the light of this opinion and of present contentions. 334 U.S. at 256–257, 68 S.Ct. at 1034.

It will be so ordered.

NO. 9–50 M.A.P.

M.A.P. Oil Co. and other independent distributors of gasoline, as heretofore reviewed, brought this private damage action against Texaco because of the latter's price increase of $.01 per gallon to its distributor class without a corresponding increase to its other classes of purchasers.

In November, 1977, DOE issued an NOPV to Texaco, advising it that DOE had reason to believe that this price increase violated allocation and price regulations. Texaco in the present action sought to join DOE as an additional party plaintiff under Fed.R.Civ.P. 19(a)(2) in reliance upon our decision in *Longview Refining Co. v. Shore*, 554 F.2d 1006 (TECA), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977), and in view of a concern that DOE's ongoing administrative enforcement proceedings might subject Texaco to inconsistent results. Texaco's motion was granted over DOE's opposition, the court adding that "Plaintiffs and Defendant shall each have 20 days leave to file a claim for relief against DOE which shall appear in the action as a third party Defendant." Texaco thereupon filed a two-count complaint against DOE, the second claim of which sought relief in reliance upon the Federal

---

**20.** Texaco argues in its brief and emphasized in oral argument that if the issues the distributors now press were in the case they "would have had the burden of proof as to each element of such alleged violations"; yet if they were pursuing these claims "surely ... some discovery would have been directed to these issues and surely they would have listed these issues in at

least their last formal pretrial statement." As we have seen, the issues were preserved in the pretrial proceedings, and lack of discovery to establish plaintiffs' position at a trial cannot be parlayed into appropriate discovery or other showing by Texaco to justify summary judgment in its favor when it, not the distributors, had the burden of proof at this stage.

Tort Claims Act (FTCA) for DOE's alleged "violation of its own regulations." [21] DOE filed a motion for judgment on the pleadings asserting lack of subject matter jurisdiction over the FTCA claim and urging dismissal on the merits.

The district court held that Texaco had stated a claim for abuse of process or malicious prosecution but that neither was cognizable as a ground for relief under the FTCA; that the elements of malicious prosecution or abuse of process had not been made out because both required the original prosecution to be unsuccessfully completed prior to initiation of the suit, and that in any event "prosecutorial immunity protects such decisions from the Federal Tort Claims Act as 'discretionary' acts." The court finally dismissed DOE as a party, concluding that it had been improperly joined in view of our intervening decision in *Dyke v. Gulf Oil Corp.*, 601 F.2d 557 (TECA 1979), because no order of DOE was at issue and no compelling circumstances for joinder were shown.

Texaco appealed the order of dismissal of the FTCA claim and the order dismissing DOE as a party. No argument has been made here in support of Texaco's objection to the latter order apart from the dismissal of the tort claim, to which a complete disposition of Texaco's appeal can be confined. Following the taking of this appeal DOE moved here for leave to file a motion to dismiss the appeal, and for an order dismissing it with prejudice, for lack of subject matter jurisdiction on the ground that Texaco had failed to satisfy the administrative claims requirement of 28 U.S.C. § 2675 and the applicable time limitation for filing a claim provided by 28 U.S.C. § 2401. We granted DOE's motion to file its tendered motion to dismiss [22] but denied without prejudice its motion to dismiss pending oral argument, choosing to have the issue of jurisdiction briefed, heard and considered in connection with the issues raised in the McWhirter appeal.

### *DOE's Motion to Dismiss the Appeal for Lack of Jurisdiction*

Texaco's action against DOE, though nominally a "Federal Tort Claim," arises directly under EPAA regulations, its gravamen being the assertion that DOE violated its own regulations promulgated pursuant to the EPAA by the decision to initiate an EPAA enforcement action and the issuance of an NOPV against Texaco. The FTCA is involved only as it might operate as a waiv-

---

21. The first claim reiterated Texaco's position concerning the regulatory and antitrust phases of the primary case between the original parties. In its "Second Claim for Relief," Texaco alleged, in substance, that "[p]rior to the filing of the complaint in this action, the distributor plaintiffs filed a formal written complaint with DOE's predecessor, the [FEA]," claiming a violation of certain regulations by Texaco; that "[b]etween the filing of the administrative complaint in ... February 1977 and November 23, 1977, DOE and its predecessor FEA purported to investigate the validity of the claims asserted [by the distributors]"; that, on information and belief, "at some point prior to November 23, 1977, [DOE] concluded that it had no reason to believe that any of the actions complained of had violated, were violating, or would violate any applicable regulation or law"; that, without divulging this conclusion, and for reasons forbidden by law, "DOE, on November 23, 1977, knowingly exceeded its authority and power by issuing to Texaco a document called a Notice of Probable Violation (NOPV)"; that by issuing the NOPV "DOE violated 10 CFR § 205.191 in that it had no reason to believe that a violation had occurred,

was continuing to occur or was about to occur as is required by said regulation"; and that "[d]espite subsequent admission by DOE that portions of the purported factual basis necessary to the stated of conclusions [sic] of the NOPV were erroneous and the product of unreliable information, DOE willfully, tortiously and unlawfully refused, and continues ... to [so] refuse to rescind the NOPV in violation of § 205.191(g)." The prayer was for declarative, injunctive and damage relief.

22. Texaco objected to the filing of the motion to dismiss since it was not filed within 10 days of the filing of the notice of appeal in accordance with the general requirements of our Rule 26. However, it is our duty to observe questions relating to jurisdiction whenever they may appear, and lack of jurisdiction is not waived by failure of a party to raise the issue at any given time. *Condor Operating Company v. Sawhill*, 514 F.2d 351, 354 (TECA); *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975). *See also Exxon Corp. v. Federal Energy Admin.*, 516 F.2d 1397 (TECA 1975).

er of sovereign immunity within its proper scope. This analysis has dispelled an initial concern that Texaco's action arose under the FTCA and not under the EPAA or regulations issued pursuant thereto, a point which neither party has argued.[23]

The jurisdictional issue which DOE presses relates to the timely presentation of an administrative claim as a prerequisite to reliance upon the FTCA. Neither party raised or addressed the latter issue in the district court, nor did that court *sua sponte* notice the problem, basing its dismissal instead upon the restricted reach of the Federal Tort Claims Act as already noted. Of course DOE's motion to dismiss this appeal by reason of the asserted lack of jurisdiction in the lower court to grant relief under the FTCA for the assigned reason does not make sense; such dismissal would conceptionally stymie our ability on appeal to rule upon the question of the jurisdiction of the district court and to affirm its dismissal of Texaco's tort action by reason of its lack of jurisdiction to do anything else. We do on the latter ground affirm the district court's order of dismissal, while reaffirming our pre-argument denial of DOE's motion to dismiss this appeal. DOE's motion raised no genuine issue of the appellate jurisdiction of this court as distinguished from the jurisdiction of the district court to grant relief under the FTCA.

*The Necessity of an Administrative Claim*

█ Section 2401 of Title 28, United States Code, dealing with "Time for commencing action against United States," provides that a federal tort claim is "forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." Title 28 U.S.C. § 2675(a) requires the presentation of such a claim to the appropriate federal agency and the agency's written denial of the claim, or the lapse of six months without agency denial of the claim, before institution of suit against the United States under the FTCA. The record demonstrates without question that these provisions were not complied with.[24]

**23.** *Cf. Bray v. United States*, 423 U.S. 73, 96 S.Ct. 307, 46 L.Ed.2d 215 (1975); *United States v. Cooper*, 482 F.2d 1393 (TECA 1973); *United States v. Zang*, 653 F.2d 493 (TECA 1981) (criminal or criminal contempt prosecutions based upon entirely different statutes, with the present case where as an "aggrieved party" under the ESA through the EPAA the gist of Texaco's complaint is that the agency had "violated its own regulations"). Unless Texaco had so based its claim in context with the EPAA regulatory scheme, its reference to the FTCA would have been meaningless. To parlay the authorities first cited into an abandonment of our jurisdiction to consider such a claim as this arising under EPAA regulations would require the overruling in principle of an unbroken line of decisions of this court exercising jurisdiction to decide claims turning in whole or in part upon the rulemaking requirements of the Administrative Procedure Act, and other decisions of similar import. *See, e.g., Citronelle-Mobile v. Gulf Oil Corp.*, 591 F.2d 711 (TECA), *cert. denied*, 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979). Since in any view the claim at bar arose at least in substantial part under EPAA regulations, for us to decide only that issue, leaving commingled tort claim questions to a separate appeal and then juggling between the two courts the con-

solidation of the respective holdings into a meaningful result would, indeed, frustrate "the uniform interpretation of the substantive provisions of the [allocation] scheme ... [and] serve to undermine the prompt resolution of [EPAA] questions." *See Bray*, 423 U.S., at 75, 96 S.Ct. at 309.

**24.** Texaco's claim against DOE is based upon DOE's investigation of Texaco culminating in the issuance of the Notice of Probable Violation on November 23, 1977. Texaco's alleged FTCA cause of action accrued on the latter date. It is neither shown nor asserted that Texaco has filed any administrative claims up to the present time. The original complaint was filed on March 15, 1977. Texaco first filed its tort claim against DOE denominated "Responsive Pleading and Claims against Defendant Department of Energy" on August 11, 1978. Filing of a claim as a part of a lawsuit does not toll the limitations applicable to the administrative claim. *West v. United States*, 592 F.2d 487 (8th Cir. 1979); *Bernard v. U. S. Lines, Inc.*, 475 F.2d 1134 (4th Cir. 1973). *Cf. Kelley v. United States*, 568 F.2d 259 (2d Cir.), *cert. denied*, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978) (involving a plaintiff who "did not know that defendant was a federal employee, or did not understand that the employee was on federal

The filing of an administrative claim to the extent required by 28 U.S.C. § 2675(a), is a jurisdictional prerequisite to suit in reliance upon the Federal Tort Claims Act and the waiver of immunity afforded by that act. *Smith v. United States*, 588 F.2d 1209 (8th Cir. 1978); *Blain v. United States*, 552 F.2d 289 (9th Cir. 1977); *Rosario v. Am. Export-Isbrandtsen Lines, Inc.*, 531 F.2d 1227 (3d Cir.), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); *Best Bearings Co. v. United States*, 463 F.2d 1177 (7th Cir. 1972); *Bialowas v. United States*, 443 F.2d 1047 (3d Cir. 1971). *See also* Anno. Tort Claims Act—Actions—Procedure, 13 A.L.R.Fed. 762 (1972).

Texaco contends that its tort claim falls within the exceptions contained in the last sentence of section 2675(a) covering claims asserted by third-party complaint, cross-complaint or counterclaim.[25] These exceptions, however, are not applicable in this case. Rule 14(a), Federal Rules of Civil Procedure, permits the defendant, as third-party plaintiff, to bring in a third-party defendant, defined as one "who is or may be liable to him for all or part of the plaintiff's claim against him."

Notwithstanding the district court's leave to Texaco for the filing of a "third-party claim" against DOE, the claim as filed did not in fact or law constitute a third-party claim under Rule 14 to which ancillary jurisdiction would attach. Texaco did not and could not seek indemnity or contribution with respect to any possible liability to the original plaintiff. *Cf. West v. United States*, 592 F.2d 487 (8th Cir. 1979). Nor was Texaco's claim against DOE a cross-claim. Rule 13(g) defines a cross-claim as "any claim by one party against a co-party arising out of the trans-

action or occurrence that is the subject matter . . . of the original action." It is debatable whether Texaco's claim arose out of the same transaction or occurrence as the plaintiffs' claim did, but in any event Texaco and DOE were adverse parties rather than co-parties. *See Schwab v. Erie Lackawanna Railroad Co.*, 438 F.2d 62, 66 (3d Cir. 1971). It would be specious to characterize them as co-parties since their actual and only relationship to each other throughout the litigation was that of plaintiff and defendant. *See Stahl v. Ohio River Company*, 424 F.2d 52, 55 (3d Cir. 1970); *Rosario*, 531 F.2d at 1231 n.8. It would be equally wrong to consider Texaco's action as a "counterclaim"; the government asserted no claim against Texaco in this litigation. *Rosario, supra*; 6 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1444 at 234, § 1404 at 15 (1971).

Texaco initially moved "to join [DOE] as a plaintiff in this action pursuant to Rules 19 and 21" and contends here that it should not be prejudiced by the district court's improper designation of DOE as a "third-party defendant." We are not here concerned with mere form. However designated, in substance Texaco's claim against DOE constituted a direct, original complaint, *Rosario, supra*.

We have here simply an improper case for ancillary jurisdiction, which is the conceptual basis of the exceptions to the necessity of filing administrative claims under the FTCA. Beyond the question of whether the original complaint of the distributors and Texaco's claim arose out of the same transaction or occurrence, is the problem of whether it should be considered a claim at all with jurisdictional consequences under the FTCA. Surely the district court was

---

business," in the context of a state action removed to a federal court).

**25.** (a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. . . . The provisions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.

right in its recognition that Texaco's claim was in the nature of one for malicious prosecution or abuse of process. Such a claim not only is devoid of merit under the FTCA but for the purpose of avoiding the bar of governmental immunity should not be considered a counterclaim, cross-claim or third-party complaint at all within the contemplation of section 2675(a) of the Act. *See United States v. Chatham*, 415 F.Supp. 1214 (N.D.Ga.1976); *Gaudet v. United States*, 517 F.2d 1034 (5th Cir. 1975).[26]

█ We have considered all of the other counter-arguments presented by Texaco, but are constrained to conclude for the reasons stated that the district court had no jurisdiction to grant relief against DOE or the United States by reason of failure of Texaco to file an administrative claim. The circumstance that in any event Texaco could not recover because its claim falls within the exceptions to coverage by the FTCA, as we implicitly recognized in discussing the question of lack of jurisdiction, does not relieve us from the duty to rest our decision upon the latter ground which is preemptive and sufficient. We do not reach the additional asserted defenses of "discretionary function," and "prosecutorial immunity," nor the perhaps correctable defect in Texaco's claim which does not name the "United States" as a party defendant.[27]

### Conclusions

In No. 9–49 we reverse the district court's decision granting the motion for summary judgment and remand for further proceedings consistent with this opinion.

In No. 9–50 we affirm the judgment of the district court dismissing Texaco's counterclaim.

IT IS SO ORDERED.

DUNIWAY, Judge, concurring and dissenting:

In No. 9–49, I concur.

In No. 9–50, I dissent, because I believe that we do not have jurisdiction of the appeal.

In No. 9–50, the claim asserted by Texaco is one under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674, against DOE. The trial court concluded that Texaco had stated a claim for relief based upon abuse of process or malicious prosecution against Texaco by DOE by means of violations of DOE's own regulations.

The majority opinion holds that this claim "arises directly under EPAA regulations." I cannot agree. Our jurisdiction was created by the Economic Stabilization Act of 1970, 12 U.S.C. § 1904, note, incorporated by 15 U.S.C. § 754. Section 211(b)(2) of that Act defines our jurisdiction as: " . . . exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder."

We have been strict in limiting our jurisdiction to these matters. The leading case is *United States v. Cooper*, Em.App., 1973, 482 F.2d 1393. There, Cooper was indicted for federal offenses, one of which was viola-

---

**26.** It might be argued, however pointless pragmatically, that even though Texaco's claim may be precluded by the express provisions of the Act, it is nonetheless sufficient to invoke an exception therein provided to the administrative filing requirement, the district court having jurisdiction to base the dismissal directly upon the lack of merit of the claim rather than its jurisdictional preclusion. An attempted justification of the former result would require a formulation not quite so simple as saying that a meritless claim is not an actionable claim; it would have to include the idea that although a frivolous claim, it yet is sufficient to avoid the jurisdictional bar that otherwise would result from its non-filing with the agency. In retro-

spect the only plausible excuse for making DOE a party to the original action was to enable Texaco to avoid the administrative claim requirement which otherwise surely would have barred consideration of its claim in a separate action. This would be both a frustration of the administrative claim requirement and a perversion of the purposes of the exceptions provided in § 2675(a). Under all of the circumstances we think it more suitable to leave the claim where Texaco left it—at the administrative starting gate as we call the final result of the race.

**27.** *See* Fed.R.Civ.P. 15(c).

tion of 18 U.S.C. § 1001 by making false representations to the Internal Revenue Service in a letter concerning rent raises to his tenants, the raises being in violation of regulations of the Price Commission under the Stabilization Act. Cooper appealed his conviction to this court. We held that the language of § 211(b)(2) should be strictly construed, that the charge was not one arising under the Stabilization Act, but was one arising under Title 18, and that we did not have jurisdiction over the appeal from the conviction on that charge. 482 F.2d at 1397–98. The present case closely resembles *Cooper*. Here, the claim "arises under" the Tort Claims Act, and the applicable law would be state law. It is true that one element of the claim would be that DOE violated its regulations. But the heart of the claim would be the tort claim, under the Federal Tort Claims Act. Similarly, in *Cooper*, one element of the offense was that the false statement related to a matter within the jurisdiction of the Price Commission. But the heart of the offense was the violation of § 1001 of Title 18.

*Cooper* was cited and quoted with approval in *Bray v. United States*, 1975, 423 U.S. 73, 96 S.Ct. 307, 46 L.Ed.2d 215. That case involved enforcement of a subpoena issued in connection with an inquiry into possible violations of the Stabilization Act.

The district court ordered compliance, and Bray refused to do so. He was then convicted of criminal contempt under 18 U.S.C. § 401. He appealed to the Tenth Circuit, which held that he should have appealed to this court, and dismissed. The Supreme Court, on certiorari, reversed, holding that the Tenth Circuit, not this court, had jurisdiction. Again, the situation in *Bray* is closely analogous to that in the case at bar.

Other cases in which we have denied jurisdiction, none of which is precisely in point, but each of which is so closely analogous as to be highly persuasive, are *United States v. Zang*, Em.App., 1981, 653 F.2d 493, 496; *Gulf Oil Corp. v. U. S. Dep't of Energy*, Em.App., 1981, 639 F.2d 766; *Texaco, Inc. v. Dep't of Energy*, Em.App., 1979, 616 F.2d 1193, 1195–98.

I would dismiss the appeal in No. 9–50 for want of jurisdiction in this court. I therefore express no opinion as to the merits of that appeal.