EASTERN AIRLINES, INC.,
Plaintiff-Appellant,

v.

MOBIL OIL CORPORATION,
Defendant-Appellee.

No. 11–6.

Temporary Emergency Court of Appeals.

Argued Jan. 10, 1984.
Decided May 21, 1984.

John G. Despriet, Gambrell & Russell, Atlanta, Ga., with whom James H. Bratton, Jr. and Donald L. Rickertsen, Atlanta, Ga., of the same firm; Laurence A. Schroeder, Walton, Lantaff, Schroeder & Carson, Miami, Fla., and William G. Bell, Jr., Eastern Air Lines, Inc., Miami, Fla., were on the brief for plaintiff-appellant.

Thomas R. Trowbridge, III, Donovan Leisure Newton & Irvine, New York City, with whom Andrew J. Kilcarr, Maureen O'Bryon and James P. Shaughnessy, Washington, D.C., of the same firm; David S. Batcheller, Smathers & Thompson, Miami, Fla.; and Charles F. Rice, Francis A. Rowen, Jr., Mobil Oil Corporation, New York City, of counsel, were on the brief for defendant-appellee.

Before GARZA, POINTER, and SEAR, Judges.

POINTER, Judge.

On the earlier appeal of this case, 677 F.2d 879 (T.E.C.A.1982), this court affirmed the summary dismissal of Eastern's claim that it had been "overcharged" by Mobil contrary to Section 210(b) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, and the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751 et seq. The case was remanded for consideration of its claim of price discrimination under

§ 210(a) of the ESA.[1] Eastern now appeals from the order of the district court, 564 F.Supp. 1131, granting Mobil's motion for summary judgment with respect to that claim. We affirm.

The critical facts are not in dispute. From November 1, 1973, to October 31, 1974, Eastern was permitted by the federal energy regulations to purchase jet fuel at the Boston and Los Angeles airports only from Mobil. During this period it paid Mobil's "posted airport prices," which (except at Boston from January 1 through March 31, 1974) were higher than the prices Mobil charged TWA for similar fuel. Eastern asserts that for a portion of this period—after March 31 at Boston and after August 31 at Los Angeles—these price differentials constituted "discrimination" proscribed by 10 C.F.R. § 210.62(b). At the prices charged TWA after those dates, Eastern would have paid Mobil $1,175,495 less than it actually paid; this amount, with interest, Eastern seeks as "damages" for a "legal wrong" under ESA § 210(a). Mobil contends—and the district court agreed—that the charges it charged TWA were permissible because of a preexisting contract and that, in any event, it could charge Eastern higher prices than TWA without violating 10 C.F.R. § 210.62(b) provided those prices were below the ceilings established under 10 C.F.R. § 212.82(a).

Eastern acknowledges that the anti-discrimination regulations would not be violated if TWA's lower prices were set by a preexisting contract. *See Trans World Airlines, Inc. v. FEO,* 380 F.Supp. 560 (D.D.C.1974), *aff'd sub nom. Air Transport Ass'n v. FEO,* 520 F.2d 1339 (T.E.C.A. 1975); *see also* FEA Ruling 1974–12. It concedes that the lower prices paid by TWA at Boston before January 1, 1974, and at Los Angeles before September 1, 1974, were pursuant to such a contract and accordingly makes no claim with respect to these price differentials.

The parties disagree, however, as to whether any such contract—or at least one effective for purposes of the energy regulations—governed the lower prices charged TWA at Boston after March 31 and at Los Angeles after August 31. Their dispute is over the law, not the critical facts.

In 1966 Mobil and TWA entered a long-term supply contract for jet fuel at four airports, including Boston and Los Angeles. The contract contained different pricing and termination provisions for each of the airports. For Los Angeles, the contract extended through 1976, with pricing provisions for the entire period. For Boston, it specified a price only through 1973; and its duration was stated as being "through December 31, 1975, contingent on mutual agreement on price for the last two years of this period," with an additional provision that, "if a mutual agreement regarding this price cannot be reached by October 1, 1973, this [agreement] may be cancelled by either party effective December 31, 1973."

No agreement was reached by Mobil and TWA prior to the end of 1973 as to future prices at Boston; and, for the first three months of 1974, TWA, like Eastern, paid Mobil's posted airport prices at that airport. Pursuant to negotiations looking toward a new contract to supersede the 1966 agreement, Mobil began charging TWA somewhat less than the posted airport prices at Boston in April 1974. In August 1974 they verbally agreed on the terms of a new long-term supply contract which, *inter alia,* provided further reduction in the prices charged at Boston after March 1974 and an increase in the prices to be charged at Los Angeles after August 1974. A refund was made by Mobil to TWA in August to reflect the retroactive reduction at Boston, and on September 4, 1974, they signed the new agreement.

Much of the dispute in this case between Eastern and Mobil regarding the status of Mobil's agreements with TWA centers on

---

**1.** Eastern had also asserted violations of the Sherman and Robinson-Patman Acts. After re-

mand, it dismissed these claims.

the provisions of 10 C.F.R. § 212.83(d).[2] That section provided an exception from the "deemed recovery rule," to be discussed later, with respect to "the price charged to the purchaser because of a price term of a written contract covering the sale of such product which was entered into on or before September 1, 1974." Mobil argues, in essence, that the prices charged TWA at Boston until the new contract was agreed upon should be treated as governed by the 1966 contract and that the new contract, including its retroactive pricing at Boston, is also within the exception of § 212.83(d) because it was formalized by a written contract and was entered into (albeit verbally) prior to September 1. We disagree. The exception applies only to the extent that a written contract entered into before September 1, 1974, specified the prices to be charged. The 1966 contract ceased after December 31, 1973, to set prices at Boston; and the new written agreement was not entered until after September 1, 1974. Verbal understandings regarding prices do not come within the exception stated in the regulation.[3]

The fact, however, that the prices charged TWA at Boston after December 31, 1973, and perhaps at Los Angeles after August 31, 1974,[4] were outside the exemption from the "deemed recovery rule" does not entitle Eastern to damages for the higher prices it paid after those dates. Rather, the consequence is that, in calculating its unrecouped increased costs incurred after May 15, 1973, Mobil would have to treat or "deem" as received from TWA the higher prices being charged to Eastern. This calculation, in turn, might affect the maximum prices that Mobil could charge its purchasers of "other covered products," the category including jet fuel.[5] Depending upon how Mobil decided to allocate its unrecouped increased costs among the various "other covered products", this calculation could affect the maximum price—sometimes referred to as the "base" or "ceiling" price—Mobil was permitted to charge purchasers of jet fuel.

It has already been held, however, on the prior appeal that the prices charged Eastern did not exceed the maximum prices that Mobil could have charged under the pricing regulations. Any remaining disagreements between the parties regarding the revenues Mobil should be "deemed" to have received for the purpose of ascertaining its unrecouped increased costs are no longer significant, other than perhaps as a matter of speculation regarding how much more Mobil might have charged Eastern.

The claim at issue on this appeal is premised upon 10 C.F.R. § 210.62(b), 39 Fed. Reg. 5311 (Feb. 12, 1974) (effective February 8, 1974), which provides:

No supplier shall engage in any form of discrimination among purchasers of any allocated product. For purposes of this paragraph, "discrimination" means extending any preference or sales treatment *which has the effect of frustrating*

2. 39 Fed.Reg. 32306, 32307 (Sept. 5, 1974).

3. Nor were the prices charged TWA here in dispute established by a contract, written or oral, that was in existence on February 8, 1974, the effective date of the anti-discrimination regulations. 39 Fed.Reg. 5311 (Feb. 12, 1974).

4. The 1966 contract specified prices for Los Angeles through 1976 and would have been within the exception to the "deemed recovery rule" had it not been superseded by the September 4, 1974, agreement. We need not decide whether, since the prices were raised by the new agreement, the exemption from any deemed recovery should continue. We do note, however, that the differential in prices charged Eastern and TWA at Los Angeles in September and October 1974 was less than what would have resulted from the preexisting contract between

Mobil and TWA and that, accordingly—even if Eastern were otherwise entitled to prevail in this litigation—it would not be entitled to any damages respecting its purchases in those months at Los Angeles.

5. The prices charged Eastern would not have affected Mobil's "bank" of unrecouped increased costs if, in setting the price charged for jet fuel to another purchaser, Mobil added a greater amount of increased costs to the May 15, 1973, selling price. In such circumstances, Mobil would be "deemed" to have received higher revenues from both TWA and Eastern at Boston and Los Angeles (subject to the exception for pre-existing contracts already discussed).

*or impairing the objectives, purposes and intent of this chapter or the Act,* and includes, but is not limited to refusal by a retail marketer of motor gasoline or diesel fuel to furnish or sell any allocated product due to the absence of a prior selling relationship with the purchaser, or establishment of new volume purchase agreements where customers of retailers agree in advance to purchase in excess of normal amounts of motor gasoline or diesel fuel and thereby receive preferential treatment. (Emphasis added.)

It is clear from the regulations as a whole that not every difference in price or other conditions of sale by a supplier constitutes a prohibited discrimination; indeed, as Eastern argues in its brief (p. 12), "the whole purpose of the 'class of purchaser' system was to maintain customary price differentials between classes of purchaser." To repeat the words of the regulation, only those preferences which have "the effect of frustrating or impairing the objectives, purposes and intent" of the regulations or the Act are prohibited by § 210.-62(b).

Eastern's position is that a differential in prices, although permissible (if not mandatory) for customers not in the same "class of purchaser," is impermissible with respect to customers in the same "class of purchaser."[6] This argument is based on one of the statutory goals—"equitable distribution ... at equitable prices ... among all users", EPAA § 4(b)(1)(F)—and a portion of the regulations providing that "in computing base prices for a covered product ... a refiner may increase its May 15, 1973 selling price to each class of purchaser ... [provided] that the amount of increased product costs included in computing base prices ... must be equally applied

to each class of purchaser." 10 C.F.R. § 212.83(c)(1)(ii).

This "equal pass-through" provision does not, however, establish the prices that must be charged by a refiner. Rather, it affects the maximum price, at that time in the regulations referred to as the "base price," that could lawfully be charged under the regulatory system. Moreover, the subsequent promulgation of the "deemed recovery" rule, as already discussed, had the effect of altering even this requirement— by permitting the unequal application of the increased costs to different classes of purchasers subject to the sanction of reducing the refiner's "bank" of unrecouped costs for purposes of calculating the maximum prices that could be charged in later months.[7]

The Act mandated "to the maximum extent practicable" both "equitable prices" (not equal prices) and also the "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." EPAA § 4(b)(1). To accommodate these and other statutory objectives, the agency decided to establish procedures for fairly allocating supplies and for determining the maximum price that could be lawfully charged any given class of purchaser, but otherwise to leave the parties free to negotiate on terms. The regulations provide a mechanism for determining a single maximum price to be charged a class of purchaser; they do not, however, call for a single price to be charged all members of such a class and, indeed, implicitly acknowledge that different prices may be charged to such purchasers. A "class of purchaser," for example, was defined as "purchasers ... to whom a person had charged a comparable [not identical] price ... pursuant to customary price dif-

---

**6.** The parties have stipulated that Eastern and TWA were at each airport in the same "class of purchaser" as defined in 10 C.F.R. § 212.31.

**7.** The damages sought by Eastern here, based upon its volume of purchases calculated at the prices charged TWA, would have greatly exceeded any "sanction" to Mobil under the "deemed recovery" rule of the regulations, which would have been based on TWA's volume of purchases.

Moreover, under Eastern's theory, Mobil could be subjected to a double "penalty"—refunding money to Eastern, but then being also deemed to have recovered from both TWA and Eastern higher revenues calculated upon the price charged to other purchasers, such as *Delta* which also bought from Mobil at posted airport prices.

ferentials between those purchasers ... [and] other purchasers." 10 C.F.R. § 212.-31. The "base" or maximum price was to be calculated by adding certain increased costs to the *"weighted average* price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973," 10 C.F.R. § 212.82(f) (emphasis added)—a recognition that different prices might be paid on the same day by different customers in the same class. As explained by the agency,

> [A] degree of price variation within a class of purchaser is not precluded. However, to the extent that price variation within a class is permissible, the FEA interprets the equal application rule to apply to such intra-class pricing to prevent the "banking" of costs which are not passed through because certain members of the class concerned are charged prices which include a lesser price per unit increment of increased costs ... [A price variation within a class of purchaser] is permissible under FEA price rules so long as it is undertaken for a purpose and in a manner which does not conflict with § 210.62(b).

Preamble to 10 C.F.R. § 212.83(h), 41 Fed. Reg. 30021, 30022 (July 21, 1976). This interpretation was reiterated in Clarification 77–2, ERA Enforcement Manual (CCH) ¶ 56,102 (1977), in which the agency reaffirmed that "a degree of price variation within a class of purchaser is not precluded by FEA regulations," noting however that the equal application rule "prevents the banking of the cost difference implemented within the class, just as it prevents the banking of the cost differences implemented between classes."

Both Eastern and Mobil rely upon *McWhirter Distributing Co. v. Texaco,* 668 F.2d 511 (T.E.C.A.1981). The court there observed that the equal application rule " 'deters unequal price increases [but] does not forbid them,' since the regulations pro-

vided a penalty for the inequality." *Id.* at 520. *McWhirter* held that summary judgment should not have been granted in view of a factual dispute as to whether the refiner had properly calculated and reported its bank of unrecouped costs under the deemed recovery rule—this dispute being material to the issue (erroneously pretermitted by the trial court) as to whether the purchasers had been charged more than the maximum allowable price under the regulations. *Id.* at 521. The court noted that unequal price increases would also violate § 210.62(b) if they had the effect of "frustrating or impairing the objectives, purposes and intent" of the Act or the regulations, but left open the question as to the circumstances under which such increases would be proscribed. *Id.* at 522–23. It is this latter question, not decided in *McWhirter,* that is before the court in the present case.

The sole basis for Eastern's claim of discrimination under § 210.62(b) is that it was charged prices which, although less than the ceiling prices, were greater than those charged another member of the same class of purchaser. Eastern does not contend that it failed to receive any products from Mobil or even that Mobil refused to negotiate with it on a long-term contract having terms comparable to that afforded TWA.[8] It voluntarily dismissed its claims under the Robinson-Patman Act of any competitive injury from discriminatory pricing. The district court correctly granted Mobil's motion for summary judgment.

AFFIRMED.

---

**8.** Indeed, Eastern made arrangements with another supplier as of November 1, 1974, when it

was first permitted to do so.