**NAUTICA INTERNATIONAL, INC., Plaintiff,**

v.

**INTERMARINE USA, L.P., Defendant.**

**No. 97–1772–CIV.**

United States District Court, S.D. Florida.

March 17, 1998.

Richard Stanton, Miami, FL, Christopher Wawack, Joseph Camardo, Auburn, NY, for Plaintiff.

C. Torrence Armstrong, McGuire, Woods, Battle & Boothe, LLP, McClean, VA, Isaac Mitrani, Mitrani, Rynor & Adamsky, P.A., Miami, FL, Matthew Simchack, Paul Khoury,

Robert E. Johnston, Washington, DC, for Defendant.

### ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS: VACATING ORDER STAYING DISCOVERY

GOLD, District Judge.

THIS CAUSE came before the Court upon defendant Intermarine USA, L.P.'s ("IUSA") Motion to Dismiss, plaintiff Nautica International, Inc.'s ("Nautica") Memorandum of Law in Opposition to Defendant's Motion to Dismiss, and IUSA's Reply to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss. Plaintiff petitions the Court in an eleven count, 166 paragraph complaint for damages, costs and attorneys' fees as provided by law for IUSA's breach of contract in the design and production of a prototype boat, in response to a solicitation by the United States Special Operations Command ("SOCOM"). Defendant seeks dismissal of this Cause pursuant to Fed. R.Civ.P. Rule 12(b)(6), for failure to state of a cause of action. After careful consideration of parties' arguments, the relevant case law and the record as a whole, the Court concludes that defendant's motion to dismiss should be granted in part and denied in part.

### I. Findings of Fact and Procedural Background

The following facts are gleaned from plaintiff's original complaint and are deemed to be true for purposes of this motion. In October 1995, SOCOM published a Request for Proposals to develop and produce a Rigid Hull Inflatable Boat ("RIB") for use by the United States Special Operations Units. SOCOM intended to make multiple awards to contractors to design and produce a prototype or Test Article from which SOCOM would choose one contractor to manufacture the production lots.

Nautica had significant experience in the production of RIBs, having manufactured these boats for more than 10 years. Nautica, however, lacked the financial resources to respond to this RFP. Accordingly, Nautica

agreed to cooperate with IMUSA to submit a joint proposal to SOCOM. Nautica was to contribute its expertise in producing RIBS and its Parent Craft,[1] and IMUSA was to contribute its financial resources and expertise in contracting with the federal government. The parties agreed to formalize the agreement in writing at a later date.

From July through November, 1995, Nautica invested over $600,000 in preparing the Parent Craft for testing. On or about December 1, 1995, Nautica and IMUSA entered into a written agreement entitled "Solicitation # USZA22–96–R–0003, Agreement for Proposal and Subsequent Production of 10 Meter Rigid Inflatable Boat (RIB)" ("Agreement"), which outlined the parties' roles in the event that SOCOM awarded the parties a Test Article, and further awarded them production lots. The Agreement provided, *inter alia*, that, 1) Nautica would provide IMUSA its design for the Parent Craft, 2) IMUSA would pay Nautica $20,000 royalty for each boat sold using Nautica's design, 3) Nautica would provide technical assistance and consultation at a reasonable cost for IMUSA's initial production, 4) Nautica would complete the Parent Craft at its own cost, 5) upon award of the SOCOM Test Article, Nautica would provide the Prototype Boat and IMUSA would contribute certain other accessories, and 6) the parties would work together exclusively for the duration of the SOCOM contract.

In early 1996, IMUSA submitted the proposal to SOCOM in its own name, identifying Nautica as its "teaming partner." On June 14, 1996, SOCOM awarded the Test Article to IMUSA at a price not to exceed $1,304,426. SOCOM awarded two other Test Article contracts, one to United States Marine, Inc., at a price not to exceed $852,338 and a second to Willard Marine, Inc., at a price not to exceed $965,454.

In late June 1996, Nautica and IMUSA began to negotiate the details of the scope of work to be performed by Nautica in production of the Test Article as anticipated by the December 1, 1995 Agreement. On July 2,

---

1. A prerequisite to submitting a bid for this contract was possession of a "Parent Craft," a sea tested RIB which would serve as the starting point for the development of the prototype craft.

1996, the parties entered into a second written agreement ("Memorandum Agreement"), in which the parties agreed as follows:

Should SOCOM award the production contract to Intermarine/Nautica, Intermarine will pay Nautica $300,000, and will have the rights to use the Nautica design and data for the production of that model, or any variation of it, based upon the same lines plan, on a non-competitive basis with Nautica.

Intermarine will pay Nautica $20,000 for each boat built under the construction contract with SOCOM and 5% for any boat sold to any other customer that Nautica would provide. If a Finder's fee needs to be paid, Nautica will inform Intermarine accordingly, prior to stipulating the sale contract.

Any advertisement done either by Nautica or Intermarine, will refer to SOCOM RIB as *Nautica–Intermarine* design or *Inter-Nautica* design.

If the boat is built by Nautica, Nautica will pay a royalty to Intermarine of the same amount indicated above. The agreement will expire five (5) years after its commencement and may be renegotiated after that time.

(Complaint, Ex. 3). The Memorandum Agreement is signed by both parties and dated July 2, 1996.

On July 23, 1996, IMUSA issued a Purchase Order to Nautica in the aggregate amount of $445,500. IMUSA confirmed in the Purchase Order that it had control over the materials to be used in the lamination process and further that it would supervise this process, giving IMUSA ultimate responsibility for the weight of the Test Article hull and deck.[2]

In a letter dated August 6, 1996, from IMUSA to SOCOM, IMUSA allegedly misrepresented that Nautica had demanded an additional $200,000 for the work in progress on the Test Article. Nautica contends that IMUSA made this request in an intentional attempt to defraud SOCOM and to damage Nautica's business reputation. After inquiry by SOCOM, IMUSA declined to pursue the requested additional funds.

IMUSA and Nautica's business relationship continued to unravel. Nautica had significant disagreements with IMUSA regarding various design issues, including the construction of radar arch, the size of the "service box," and the weight of the materials used by IMUSA and its subcontractors. Nautica also became increasingly concerned that the parties had not consummated a final contract, as contemplated by the December 1, 1995 Agreement, and that IMUSA had continued to exclude Nautica from design and production decisions of considerable importance. Nautica expressed these concerns to IMUSA in letters dated September 17, 24, 25 and 26, 1996.

On October 5, 1996, Nautica completed its portion of the production effort and shipped the hull and deck to IMUSA for acceptance. Nautica again voiced its dissatisfaction with IMUSA's work, emphasizing the excessive weight of various materials used to build the Test Article.[3] IMUSA ignored Nautica's objections. On October 30, 1996, Nautica's legal counsel sent a letter to IMUSA accusing IMUSA of failing to use its best efforts to procure the SOCOM contract, by staffing the project with inexperienced personnel, and failing to utilize Nautica's significant expertise. Nautica sought assurances from IMUSA that it was pursuing the SOCOM production contract with due diligence. IMUSA never responded.[4]

On October 31, 1996, Nautica submitted a draft contract to IMUSA to memorialize the parties' agreements, setting out their respec-

---

**2.** The weight of the Test Article was critical, because SOCOM required the Test Article to weigh under 14,000 pounds.

**3.** More specifically, Nautica objected to IMUSA's failure to use locknuts, use of unnecessarily heavy fuel tanks, the selection and installation of the batteries, and the installation of the service box which Nautica insisted was unnecessary.

**4.** Nautica contends that IMUSA intentionally dragged its feet in the production of the Test Article, because it had received a more lucrative contract to produce yachts and could not produce both the RIBs and the yachts.

tive roles for the remainder of the SOCOM contract and during production, if necessary. IMUSA refused to negotiate the contract. IMUSA also allegedly caused to be published an advertisement of the RIB on the Internet, referring to the boat as "Intermarine USA NSW RIB AT."

On or about December 2, 1996, IMUSA shipped the Test Article to SOCOM. Because the Light Load Displacement weight exceeded the 14,000 pound limit by 1,488 pounds, IMUSA attached an explanation for the excess weight, suggesting ways that the weight could be reduced. According to Nautica, IMUSA falsely blamed Nautica for exceeding the weight threshold, concluding that excessive resin content in the lamination process of the hull and deck was the prime reason for the overweight. Nautica claims that IMUSA was responsible for 2408 pounds of extra unnecessary weight.[5] Using Nautica's recommendations, IMUSA suggested to SOCOM that the SOCOM RIB could be brought into compliance.

On December 5, 1996, SOCOM declined to waive the weight requirement, issued a stop work order for the SOCOM RIB, and eliminated IMUSA from further competition for the production contracts. In a letter dated December 6, 1996, Nautica urged IMUSA to file a timely protest with the General Accounting Office to preserve the parties' rights. By letter dated December 6, 1996, IMUSA requested a debriefing from SOCOM pursuant to federal regulation, and in a letter dated December 12, 1996, IMUSA again suggested that Nautica had caused the weight problem, resulting from the high resin content of hull. Nautica contends that these statements were made in an attempt to damage its reputation. Nautica further asserts that IMUSA failed to obtain the requisite waiver for the excessive weight and further failed to submit a Contract Problem Identification, as provided by the SOCOM contract.

On or about December 17, 1996, IMUSA filed a bid protest with the General Accounting Office. Despite repeated requests for the GAO's report, IMUSA refused to provide a copy to Nautica. Nautica contends that IMUSA refused because IMUSA filed an untimely protest, destroying the parties' opportunity to rejoin the competition for the award of the production lots.

Nautica originally brought suit in the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, Florida, alleging, 1) Breach of Contract—Duty of Good Faith and Fair Dealing, 2) Breach of Contract—Failure to Pay Invoices, 3) Breach of Contract—Additional Work under Purchase Orders, 4) Unjust Enrichment, 5) Breach of Partnership Agreement, 6) Demand for an Accounting, 7) Breach of Joint Venture Agreement, 8) Demand for an Accounting, 9) Defamation, 10) Tortious Interference with Business Relationships, and 11) Fraud in the inducement. Defendant subsequently timely removed this action to this Court and filed the motion now before the Court.

## II. Standard for Motion to Dismiss

Dismissal of a complaint under Fed.R.Civ.P. 12(b)(6) is appropriate "only if it is clear that no relief could be granted under *any set of facts* that could be proved consistent with the allegations." *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir.1994) (quoting *Hishon v. King and Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)) (emphasis added). On a motion to dismiss, the court must accept all the alleged facts as true and find all inferences from those facts in the light most favorable to the plaintiff. See, e.g., *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir.1994). The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir.1985) (citation omitted); *Jackam v. Hospital Corp. Of America Mideast*, 800 F.2d 1577, 1579 (11th Cir.1986). The complaint should not be dismissed for

---

5. Nautica asserts that IMUSA is responsible for over 2000 pounds in necessary weight by doing the following: installing two fuel tanks (250 pounds extra) and a fiberglass radar arch (828 pounds extra); filling strakes with microspheres (90 pounds); installing heavy storage hatches (180 pounds extra), an unnecessary service box (150 pounds) and stainless steel electrical breaker boxes (160), as well as other unnecessarily heavy items. (Complaint, ¶ 80).

failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sea Vessel, Inc. v. Reyes,* 23 F.3d 345, 347 (11th Cir.1994) (citation omitted). But, to survive a motion to dismiss, a plaintiff may not merely "label" his or her claims. *Blume v. Mylander,* 919 F.Supp. 423, 425 (M.D.Fla.1996). Moreover, when, on the basis of a dispositive issue of law, no construction of the factual allegations of a complaint will support the cause of action, dismissal of the complaint is appropriate. *Executive 100, Inc. v. Martin County,* 922 F.2d 1536 (11th Cir.1991); *Powell v. United States,* 945 F.2d 374 (11th Cir.1991); *Marshall County Bd. Of Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir.1993).

## III.  Discussion and Analysis

### A.  Adequacy of Complaint

Defendant first argues that Nautica's Complaint is incomplete, confusing and ambiguous, and fails to meet the pleading requirements of Fed.R.Civ.P. Rule 8(a)(2). More specifically, IMUSA contends that due to plaintiff's reference in its Complaint to a number of different agreements, defendant cannot answer properly, as it cannot determine which agreement, if any, has been breached. The Court finds defendant's argument without merit.

■ Although the Court recognizes that the Complaint is far from a picture of clarity, the Complaint certainly meets the minimal requirements of Fed.R.Civ.P. Rule 8, providing IMUSA with sufficient notice to answer. Taking plaintiff's allegations in the best possible light, as the Court must, Nautica establishes the existence of an oral agreement between Nautica and IMUSA to cooperate in the submission of a bid to obtain the SOCOM production contract, at least two preliminary written agreements regarding the party's respective roles in the bid process, and a number of unpaid invoices and purchase orders, all for Nautica's substantial role in the design and production of the Prototype Craft. These allegations provide sufficient notice to enable IMUSA to respond adequately.

### 1.  Breach of Implied Duty of Good Faith (Count I)

In Count I, plaintiff contends that IMUSA breached its express and implied duties of good faith and fair dealing arising from the two written agreements executed by the parties. Defendant attacks this count on substantive grounds, arguing that a party cannot maintain a claim for breach of the implied covenant of good faith where that party cannot claim breach of any express contractual provision. See *Barnes v. Burger King Corp.,* 932 F.Supp. 1420, 1438–40 (S.D.Fla.1996); *Burger King Corp. v. Holder,* 844 F.Supp. 1528, 1530 (S.D.Fla.1993). Thus, under the facts of this case, if plaintiff cannot maintain a claim for breach of an express term of an agreement between the parties, then Nautica cannot maintain a claim for breach of the implied covenant of good faith.

■ As a threshold matter, under Florida law, contracts may be either express or implied in fact. *Bromer v. Florida Power & Light Co.,* 45 So.2d 658 (Fla.1949). Express contracts are based upon mutual consent or assent. *Board of Comm'rs v. Forbes Pioneer Boat Line,* 80 Fla. 252, 86 So. 199 (1920). Express contracts may include implied terms. *Id.;* see also *Heredia v. Safeway Trails, Inc.* 369 So.2d 418, 420 (Fla. 3d DCA 1979). Thus, a contract may have legal effect beyond its actual words, resultant upon its wording and purpose and may embody obligations which legally are to be implied from its words and the relationship of the parties. *Wilcox v. Atkins,* 213 So.2d 879, 882 (Fla. 2d DCA 1968).

■ Here, the express terms of the Agreement assented to, as alleged, were that the parties would refer to the SOCOM RIB in any advertisement as the *Nautica–Intermarine* or the *InterNautica* design. Taking Nautica's allegations as true, IMUSA advertised the SOCOM RIB on the Internet, referring to the prototype boat as "Intermarine USA NSW RIB AT." That action constituted an express breach of a term of an agreement between IMUSA and Nautica, and, therefore, plaintiff, as a matter law, may bring a claim for breach of implied covenant of good faith. *Burger King Corp. v. Holder,* 844 F.Supp. at

1530. As such, dismissal of this count is not warranted at this juncture.

## 2. Breach of Contract (Counts II and III)

In Counts II and III, plaintiff alleges breach of contract for failure to pay, 1) certain invoices for work performed within the scope of the parties' Agreement, and 2) Purchase Orders for additional work not anticipated in the Agreement. Defendant argues that plaintiff's allegations fail to satisfy at least one of the fundamental elements of breach of contract, namely breach of a specific obligation assumed. *Industrial Medicine Publishing Co. v. Colonial Press of Miami, Inc.*, 181 So.2d 19, 19 (Fla. 3rd DCA 1965) (setting forth elements of breach of contract as execution of contract, assumption of an obligation under the terms of the contract, and breach of the assumed duty). Defendant's argument must fail at this early stage in this case.

■■■ Plaintiff alleges that defendant orally agreed to assume Nautica employees' travel expenses to consult with IMUSA staff on certain design issues outside of Nautica's area of responsibility, and that IMUSA refused to pay those expenses. It is not necessary under Florida law to reduce an agreement to writing to bind the parties, as long as the parties intend to be bound at the time of the oral agreement. *Eastern Air Lines, Inc., v. Mobil Oil Corp.*, 564 F.Supp. 1131, 1145 (S.D.Fla.1983), *aff'd by*, 735 F.2d 1379 (Em.App.1984) ("If parties so intend, a contract is binding from the time it is made even though the parties also agree that a formal writing embodying its provisions will subsequently be prepared."). The rule that when "parties intend a negotiation to be reduced to a formal writing there is no binding contract until a formal writing is achieved" applies only when "the parties do not intend to be bound by their negotiations until a formal written contract is executed." *Housing Auth. of Fort Pierce v. Foster*, 237 So.2d 569, 571–72 (Fla. 4th DCA 1970). The parties

intent, of course, is what ultimately controls. Simply because the parties contemplated the drafting of a subsequent formal, written contract, does not denote that they did not intend to be bound immediately by their oral or written negotiations. *Lifecare International Incorporated v. CD Medical, Inc.*, 68 F.3d 429, 436 (11th Cir.1995) (applying Florida law) (citations omitted), *mod. on other grounds*, 85 F.3d 519 (11th Cir.1996).

■■■ Applying these principles here, the Court cannot say upon examination of plaintiff's allegations that no contract existed for the payment of the sought-after expenses. It may be, as IMUSA contends, that no binding contract existed here. But this matter is before the Court on a motion to dismiss, and the Court is bound to accept plaintiff's allegations as true. Examining the evidence in this light, plaintiff's breach of contract claim withstands defendant's motion to dismiss, as defendant breached its assumed obligation to reimburse Nautica for its employees' expenses accrued during its employee's visit to IMUSA.[6] See *Bluevack, Inc. v. Walter E. Heller & Co.*, 331 So.2d 359, 360 (Fla. 3d DCA 1976).

## 3. Unjust Enrichment (Count IV)

In Count IV, plaintiff brings a claim for unjust enrichment based upon the benefit IMUSA allegedly reaped from Nautica's labor, effort and expense in the development of the Parent Craft and the SOCOM RIB. Defendant argues that plaintiff cannot allege a claim for unjust enrichment, unless it also alleges that it has no adequate remedy at law, which Nautica has failed to do.

■■■ "The elements of a claim for unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof." *Hercules, Inc. v. Pages*, 814 F.Supp. 79, 80

---

6. The Court also notes that the parties conduct is consistent with the existence of a contract: Nautica contributed substantially to the parties' teaming effort by providing the Parent Craft, designing and producing the hull and deck of Test Article and received substantial consideration for their effort.

(M.D.Fla.1993) (citing *Henry M. Butler, Inc. v. Trizec Properties, Inc.*, 524 So.2d 710, 712 (Fla. 2d DCA 1988)). "[T]he theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy." *Gary v. D. Agustini & Asociados, S.A.*, 865 F.Supp. 818 (S.D.Fla.1994) (quoting *Bowleg v. Bowe*, 502 So.2d 71, 72 (Fla. 3d DCA 1987)).

As stated above, the basis for plaintiff's unjust enrichment claim is the tangible benefit defendant received when IMUSA utilized the Parent Craft and Nautica's demonstrated expertise, resources and investment, to develop the RIB SOCOM. Assuming without deciding that defendant's conduct constitutes breach of contract, Nautica has a contractual remedy. But more importantly, Nautica fails to allege that its contractual remedy is inadequate. Therefore, Nautica has failed to state a claim for unjust enrichment. *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F.Supp. 1511, 1518–18 (S.D.Fla.1996) ("Because Plaintiffs fail to allege that an adequate remedy at law does not exist, and the Court is not convinced that this is clear from the face of the Amended Complaint, Count III fails to state a claim for unjust enrichment and will be dismissed from the Amended Complaint"); *Gary v. D. Agustini & Asociados, S.A.*, 865 F.Supp. 818, 827 (S.D.Fla.1994) (same) (citing *Bowleg v. Bowe*, 502 So.2d at 72). Upon proper motion, plaintiff may be able to cure this failure by amendment of its pleading.

### 4. Breach of Fiduciary Duty Arising From Alleged Breach of Partnership or Joint Venture Agreement (Counts V and VII)

In Counts V and VII, plaintiff brings claims for breach of IMUSA's fiduciary duty, predicated upon the existence of a partnership (Count V) and/or Joint Venture agreement (Count VII). Defendant argues first that the Counts V and VII are redundant, because a joint venture is a form of partnership.

Defendant is certainly correct that, under Florida law, joint ventures are governed by principles of partnership law, *Xanadu of Cocoa Beach, Inc. v. Zetley, et al.*, 822 F.2d 982, 986 (11th Cir.1987), but "[t]he relationships of joint venture and partnership are similar and governed by the same rules of law, although distinguishable in certain respects." *Deal Farms, Inc. v. Farm & Ranch Supply, Inc.*, 382 So.2d 888, 890 (Fla. 1st DCA 1980). "The outstanding difference between a joint venture and a partnership is that the former relates to a single transaction, although it may comprehend a business to be continued over several years, while the latter relates to a general and continuing business of a particular kind, although there may be a partnership for a single transaction." *Kislak v. Kreedian*, 95 So.2d 510, 514–15 (Fla.1957) (citation omitted). This argument must fail. Florida state law recognizes a distinction between a partnership and a joint venture, and plaintiff may plead in the alternative.

Defendant next argues that, as a matter of law, plaintiff has failed to allege a partnership between the parties, because the parties' written agreements set forth a flat fee exchange for services, not an arrangement for a percentage of profits. Fla. Stat. § 620.585 defines a partnership as an "association of two or more persons to carry on a business for profit as co-owners." [7] *Peoples Gas System, Inc. v. Acme Gas Corp.*, 689 So.2d 292, 298 (Fla. 3d DCA 1997) (citing § 620.585, Fla. Stat.). A party attempting to prove the existence of a joint venture or partnership has the burden of demonstrating the satisfaction of the elements. *Kislak*, 95 So.2d at 515. The Court concludes that plaintiff has satisfied this burden on a motion to dismiss. Attached to the Complaint are two written agreements, which evidence an understanding between Nautica and IMUSA to share a percentage of revenue from sales of the SOCOM RIB to the United States or

---

**7.** A joint venture is established contractually. The contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses; and (4) the right of joint control. *Kislak*, 95 So.2d at 515.

any other customer.[8]

■ Defendant next argues that Counts V and VII, even if properly pled, are barred by the economic loss rule, as both are grounded on claims for breach of fiduciary duty.[9] This Court's research indicates that the focal question in examining this issue is whether plaintiff's breach of fiduciary duty claim is dependent upon the existence of the contract, or whether the fiduciary duty allegations arise from duties beyond the scope of those imposed by the contract. *Future Tech International, Inc. v. Tae Il Media, Ltd.,* 944 F.Supp. 1538, 1569 (S.D.Fla.1996) (Marcus, J.) (finding that the economic loss rule did not bar claim for breach of fiduciary duty, because the fiduciary duty allegations arose from defendant's acts not addressed in the parties' agreements); *Greenfield v. Manor Care, Inc.,* 705 So.2d 926, 931–32 (Fla. 4th DCA 1997) (same); but see *McCutcheon v. Kidder, Peabody & Co., Inc.,* 938 F.Supp. 820, 822 (S.D.Fla.1996) (Ryskamp, J.) (dismissing claim for breach of fiduciary duty, as claim was dependent on the existence of a contract); *Interstate Securities Corp. v. Hayes Corp.,* 920 F.2d 769, 777 (11th Cir. 1991) (same).

Plaintiff alleges in its Complaint as follows: That by the written agreements between the parties, and by their actions, a partnership [joint venture] was created between IMUSA and Nautica, the terms of which required IMUSA to cooperate with Nautica on the NSW RIB Project, and include Nautica in important design and production decisions. As such, IMUSA had a fiduciary duty toward Nautica to act in good faith during the existence of the partnership agreement.

IMUSA breached its fiduciary duty toward its partner Nautica by failing to cooperate with Nautica, and excluding Nautica from important design and production decisions during Test Article fabrication.

IMUSA breached its fiduciary duty toward its partner Nautica by intentionally and willfully failing to use its best efforts in pursuing the SOCOM production contract.

(Complaint, ¶¶ 131–33; 140–42). Plaintiff, therefore, contends that defendant breached its fiduciary duty by failing, 1) to use its best "good faith" efforts in procuring the SOCOM RIB contract, 2) to cooperate with Nautica in developing the Test Article and 3) to include Nautica in design and production decisions. This is the same conduct allegedly giving rise to plaintiff's breach of contract claims. Accordingly, the Court concludes that Counts V and VII are due to be dismissed. *Interstate Securities Corp.,* 920 F.2d at 777; *McCutcheon,* 938 F.Supp. at 822.

### 5. Partnership/Joint Venture Accounting (Counts VI and VIII)

■ In Counts VI and VIII, plaintiff petitions for an accounting based upon the existence of a fiduciary relationship springing from the parties' partnership and/or joint venture. As stated above, at this early juncture, plaintiff's allegations are sufficient to support its claim that a partnership or joint venture existed here. But Defendant contends that plaintiff's Complaint is lacking, as plaintiff failed to allege that its remedy at law is inadequate. *Kee, CTL v. National Reserve Life Insurance Company,* 918 F.2d 1538, 1540 (11th Cir.1990) ("Under Florida law, a party seeking an equitable accounting must show the existence of a fiduciary relationship or a complex transaction and must demonstrate that the remedy at law is inadequate"). There is no showing here that plaintiff's remedy at law is inadequate; nor has plaintiff alleged that this is the case.

8. The Agreement provides:

"Nautica International will be paid a royalty fee of $20,000 for each vessel sold from the 10 meter RIB design, or any development of this design, regardless of customer or geographic location."

(Complaint, Ex. 1).

The Memorandum Agreement provides:

"Intermarine will pay Nautica $20,000 for each boat under the construction contract with SOCOM, and 5% for any boat sold to any customer that Nautica would provide. If a Finder's fee needs to be paid, Nautica will inform Intermarine accordingly, prior to stipulating the sale contract...... If the boat is built by Nautica, Nautica will pay a royalty to Intermarine of the same amount indicated above."

(Complaint, Ex. 3).

9. Defendant cites no case law in support of this argument. (Reply Memorandum, p. 7).

Plaintiff argues, however, that the language quoted above from *Kee* is dicta, and that Florida does not require a party to allege that its remedy at law is inadequate to bring a claim for an accounting. It is well settled under Florida law, however, that an action for an accounting will not stand where plaintiff has not alleged the inadequacy of the remedy at law. *Dahlawi, et al. v. Ramlawi*, 644 So.2d 523, 524 (Fla. 3d DCA 1994) (quoting *F.A. Chastain Constr., Inc. v. Pratt*, 146 So.2d 910, 913 (Fla. 3d DCA 1962) ("Matters of account are one of the ordinary sources of equity jurisdiction and ... equity will take cognizance of cases where the contract demands between litigants involve extensive or complicated accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity")); see also *Chiron v. Isram Wholesale Tours and Travel, Ltd.*, 519 So.2d 1102, 1103 (Fla. 3d DCA 1988). Accordingly, Counts VI and VIII will be dismissed.

### 6. Defamation (Count IX)

In order to state a cause of action for defamation under Florida law, plaintiff must allege that: (1) defendant published a false statement, (2) that the statement was communicated to a third party, and, (3) that the plaintiff suffered damages as a result of the publication. *Parsons v. Nationwide Mut. Ins. Co.*, 889 F.Supp. 465, 469 (M.D.Fla. 1995) (citing *Baker v. McDonald's Corp.*, 686 F.Supp. 1474 (S.D.Fla.1987), *aff'd*, 865 F.2d 1272 (11th Cir.1988); *Axelrod v. Califano*, 357 So.2d 1048 (Fla. 1st DCA 1978)). Plaintiff alleges that IMUSA defamed plaintiff on two different occasions, when 1) IMUSA intentionally misrepresented to SOCOM that Nautica had demanded $200,000 in additional funds for its work effort; and 2) IMUSA submitted a document to SOCOM stating that the excessive weight of the Test Article was Nautica's fault. In both cases, taking the allegations contained in the Complaint as true, plaintiff has sufficiently pled the elements of defamation—a published false statement, communicated to a third party, causing damages—in order to withstand a motion to dismiss.

### 7. Tortious Interference with Business Relationships (Count X)

Under Florida law, a plaintiff must prove the following elements to state a claim for tortious interference with advantageous business relations: (1) the existence of a business relationship under which the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship; and (3) damage to the plaintiff as a result of the tortious interference with that relationship. See *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1348–49 (11th Cir.1987) (citations omitted); *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985). The thwarted business relationship need not be evidenced by an enforceable contract. *United Yacht Brokers, Inc. v. Gillespie*, 377 So.2d 668 (Fla.1979). "An action for intentional interference is appropriate even though it is predicated on an unenforceable agreement, if the jury finds that an understanding between the parties would have been completed had the defendant not interfered." *F.T. Landry v. Hornstein*, 462 So.2d 844, 846 (Fla. 3rd DCA 1985) (citing *United Yacht Brokers, Inc.*, 377 So.2d at 668).

Defendant first argues that plaintiff's allegations do not satisfy the elements of this claim. More specifically, defendant argues that plaintiff has failed to identify the "foreign governments" with whom it had an expectation to contract for sales of the SOCOM RIB. The Florida Supreme Court has held that "no cause of action exists for tortious interference with a business's relationship to the community at large." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 815 (Fla.1994) (citation omitted). "In order to establish the tort of tortious interference with a business relationship, the plaintiff must prove a business relationship with identifiable customers." *Ferguson Transp., Inc. v. North American Van Lines, Inc.*, 687 So.2d 821, (Fla.1996).

Here, plaintiff alleges:

"That, upon information and belief, during the course of the NSW RIB project, IMUSA was aware that foreign governments

intended to purchase from Nautica RIBS based on the design developed during the NSW RIB project, and that such sales were contingent on SOCOM awarding the Production contract to IMUSA."

(Complaint ¶ 153). A plain reading of plaintiff's claim reveals that its tortious interference claim is not predicated upon relationships with the community at large. Instead, Nautica asserts that defendant has interfered with its contracts by and between it and foreign governments who intended to purchase the SOCOM RIB upon the award of the Production contract. "Although the complaint is drafted at a high order of abstraction, and does not specifically identify each of the relationships allegedly interfered with, we are hard pressed to conclude that at this early stage of the proceedings that [Nautica] could prove no facts to support its cause of action." *Future Tech International, Inc. v. Tae Il Media, Ltd.*, 944 F.Supp. 1538, 1570 (S.D.Fla.1996), (Marcus, J.). This Court agrees with Judge Marcus that on a motion to dismiss, this claim is not ripe for dismissal on the basis that plaintiff has failed to satisfy the elements of this cause of action.

Defendant next argues that Nautica failed to establish a tortious interference claim as a matter of Florida law, because a party to a contract cannot be liable for interference with that contract. *Genet Co. v. Annheuser–Busch, Inc.*, 498 So.2d 683, 684 (Fla. 3d DCA 1986). In *Genet*, plaintiffs entered into an agreement with a liquor wholesaler to purchase the wholesalership and the wholesale agreement required approval by liquor manufacturer, the defendant. When the defendant withheld its approval, the plaintiff sued for tortious interference with a business relationship. The appellate court affirmed a grant of summary judgment to the defendant on this claim. The Court stated that:

> Because plaintiffs' agreement with [the wholesaler] was specifically conditioned upon [defendant's] approval, as a matter of law, [defendant] cannot be liable for tortious interference with their agreement.... The tort of willful interference with a business relationship does not exist where the defendant was the source of the

business opportunity allegedly interfered with.

*Id.* at 684. The appellate court's ruling on this issue was based squarely on Florida law citing the above stated proposition. *Genet*, 498 So.2d at 684.

*Genet* is factually distinguishable from the case at bar. Plaintiffs in *Genet* were prospective purchasers of rights subjected to the defendant's consent. When defendant denied its consent, as was its contractual right, the plaintiff sued for tortious interference with a business relationship. Here, Nautica did not have to obtain IMUSA's consent to sell the SOCOM RIB to foreign governments. Nautica, therefore, is in a different position than the plaintiff in *Genet*.

■ The issue still remains, nevertheless, whether the well-established proposition under Florida law—a party to a contract cannot sue other parties to that contract for tortious business interference—precludes plaintiff from bringing this cause of action. See *Cedar Hills Properties Corp. v. Eastern Fed. Corp.*, 575 So.2d 673 (Fla. 1st DCA 1991); *Genet Co.*, 498 So.2d at 684; *United of Omaha Life Insurance Co. v. Nob Hill Associates*, 450 So.2d 536, 539 (Fla. 3d DCA 1984); *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1224 (Fla. 3d DCA 1980); *Mitchell v. School Board of Dade County*, 566 So.2d 2 (Fla. 3d DCA 1990). Plaintiff's claim is based upon sales of the SOCOM RIB to "foreign governments," which sales allegedly would have occurred after, and separate and apart from, the SOCOM production contract. There is no evidence that IMUSA would have been an interested party in this transaction in any way. As such, defendant cannot rely on this principle to dismiss this cause of action.

IMUSA next argues, again relying on *Genet*, that as the "source" of any Nautica contract for the sale of the SOCOM RIB, Nautica cannot maintain a claim for tortious interference with a business relationship. In support of this contention, IMUSA asserts that Nautica's business opportunity was contingent upon it (IMUSA) obtaining a production contract from the United States government. While it is true, as defendant contends, that securing the SOCOM production contract was a condition precedent to

these sales, this does not make IMUSA the source of Nautica's contract to sell the SO-COM RIB to "foreign governments." See *Genet Co.*, 498 So.2d at 684; *Hall v. Burger King Corp.*, 912 F.Supp. 1509, 1538 (S.D.Fla. 1995) (finding that Hall had no claim against Burger King because Burger King itself was "the source of the business opportunity [it] allegedly interfered with").

Each of the above-cited cases involved a plaintiff who was suing the party on the opposite side of the contract or business relationship. For instance, in *Hall*, defendant Burger King Corp. ("BKC") allegedly interfered with the plaintiff's attempts to assign the franchise agreement to a purchaser. Like the Court in *Genet*, Judge Kehoe of this Court held that defendant BKC was the source of the contract, as BKC had a contractual right to approve or disapprove of any assignment of the BKC franchise. *Hall v. Burger King Corp.*, 912 F.Supp. at 1538. As such, plaintiff's tortious interference claim could not stand. *Id.* In contrast to *Genet* and *Hall*, Nautica and IMUSA were "teaming partners" in this production effort, both on the same side seeking to win a production contract with the United States government. This case is, therefore, distinguishable from those relied upon by defendant. Accordingly, based upon the foregoing, plaintiff's cause of action for tortious interference of a business relationship will withstand the motion to dismiss.

### 8. Fraudulent Inducement (Count XI)

■ Defendant next argues that plaintiff's claim for fraudulent inducement is barred by the economic loss rule. "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1240 (Fla.1996), *reh. denied*, (Fla. 1997) (citation omitted). "More specifically, the interest protected by fraud is a plaintiff's right to justifiably rely on the truth of a

defendant's factual representation in a situation where an intentional lie would result in loss to the plaintiff." *Id.*

In 1996, the Florida Supreme Court held that "[f]raudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract." *HTP*, 685 So.2d at 1239. It normally "occurs prior to the contract and the standard of truthful representation placed upon the defendant is not derived from the contract." *Id.* (quoting *Woodson*, 663 So.2d at 1331 (Altenbernd, J., dissenting)). "Whether the defendant was truthful during the formation of the contract is unrelated to the events giving rise to the breach of the contract." *Id.* (quoting *Williams v. Peak Resorts Int'l, Inc.*, 676 So.2d 513, 517 (Fla. 5th DCA 1996)). Accordingly, in *HTP, Ltd.*, the Florida Supreme Court "recognized that fraudulent inducement claims may coexist with breach of contract claims, safe from the economic loss rule because the interest protected by fraud is society's need for true factual statements in important human relationships, primarily commercial or business relationships." *Id.* at 1240.

■ Plaintiff alleges in its complaint as follows:

That prior to Nautica entering into the December 1, 1995, Agreement with IMU-SA, IMUSA stated that it would cooperate with Nautica on the NSW RIB Project, and use its best efforts to compete for the award of the SOCOM production contracts should IMUSA be awarded the contract for the Test Article.

That at the time the statements were made, IMUSA knew they were false because it had no intention of cooperating with Nautica, or using its best efforts to compete for the SOCOM production contract.

That IMUSA intended that Nautica rely on the statements.

That the statements were material to Nautica in that Nautica would not have entered into the Agreement with IMUSA, and proceeded with the preparation of the Parent Craft, or with the fabrication of the Test

Article, had it known the statements were false.

(Complaint, ¶¶ 160–163). Defendant argues that plaintiff relies on the same allegations—defendant's failure to use its best efforts—to sustain both its contract claim and its claim for fraudulent inducement, and, therefore, the Court should dismiss this claim. "The analysis presents a question of timing: does this tort claim that Defendants fraudulently induced Plaintiffs to contract ... arise from conduct prior to, and distinct from, the alleged willful breach of that contract?" *Leisure Founders, Inc. v. CUC International, Inc.*, 833 F.Supp. 1562, 1573 (S.D.Fla.1993) (Marcus, J.). To prevail on this claim, plaintiff will have to demonstrate that defendant induced plaintiff to participate in this joint project by promising to use its best efforts to procure the SOCOM RIB contract. This is, of course, distinct from proof that defendant actually did not use its best efforts, which plaintiff relies upon to support its breach of contract claim. As such, plaintiff's claim here attacks conduct prior to any alleged agreement between the parties and does not fall within the scope of the economic loss rule. *Id.*

Accordingly, it is

**ORDERED AND ADJUDGED** that defendant IMUSA's Motion to Dismiss [D.E. # 5] be, and it is hereby GRANTED IN PART. Counts IV, V, VI, VII, VIII are dismissed. It is further

**ORDERED AND ADJUDGED** that plaintiff's Motion for Oral Hearing on Motion to Dismiss [D.E. # 17] be, and it is hereby DENIED AS MOOT. It is further

**ORDERED AND ADJUDGED** that Magistrate Judge Dube's Order staying discovery [D.E. # 39] be, and it is hereby VACATED. It is further

**ORDERED AND ADJUDGED** that the Clerk of Court is directed to remove these motions [D.E. # 5, D.E.# 17] from the pending motions list.